### TOM PHIPPS v. THE STATE.

*No. 739.   Decided June 8.*

1. **Murder—Absent Witness—Continuance.**—Where, on a trial for murder, the defendant testified that deceased, when ordered to leave the store, took his hand from the waistband of his pants and put it to his side, and defendant's motion for a continuance showed the discovery of a witness who would corroborate this testimony, and that there was sufficient diligence used, and that no other competent witness could testify to the same facts, *Held,* the motion for a continuance should have been sustained, as such evidence would have been valuable to corroborate defendant.

2. **Same—Evidence—Acts and Conduct of Deceased.**—Where the State was permitted to prove that deceased had a habit of putting his hands in the waistband of his pants and leaning forward, and the evidence failed to show that defendant was acquainted with this habit, *Held,* the evidence was not admissible.

3. **Same—Self-Defense—Apparent Danger—Charge.**—Where, on a trial for murder, the evidence showed that deceased was preparing to make an attack on defendant, the court charged the jury, in effect, to base defendant's right of self-defense on the theory that deceased "had made an attack" on him. *Held,* error. Defendant had a right to act upon the appearance of danger as it presented itself at the time. The law does not require him to wait until an attack is actually made.

APPEAL from the District Court of Jack.   Tried below before Hon. J. W. PATTERSON.

Tom Phipps, the defendant, was convicted of murder in the second degree. and his punishment assessed at twenty years in the penitentiary.

The facts are fully stated in the opinion.

*W. E. Taylor, Jones & Gilliland,* and *Stark & Stark,* for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—The appellant in this case was tried under an indictment charging him with murder, was convicted of murder in the second degree, and his punishment assessed at twenty years in the penitentiary, and from the judgment and sentence of the lower court he prosecutes this appeal.

We will state so much of the case as is necessary to present the appellant's assignments of error. The appellant, Tom Phipps, was engaged with his father in the mercantile business in Jacksboro, and owned a store on the west side of the square. The deceased lived at or near Jacksboro, and was killed by the defendant, Tom Phipps, on the night of the 26th of February, 1895. The evidence discloses, that there existed a state of ill-feeling between the deceased and the defendant, which had been pending some little time before the homicide. The record discloses, that a week or ten days before the difficulty occurred the deceased was in the store of the defendant; that it was about time to close up, and that deceased was putting paper in the stove; that defendant, Tom Phipps, requested him to desist, as it was about time to close up, and he did not want to leave any fire in the stove; but the deceased did not regard his request. Thereupon defendant told him to leave. Some words were passed. The defendant got an axe handle, and started towards deceased. Deceased drew his knife. The defendant then laid the axe handle down. Deceased thereupon closed his knife, and walked out of the store, whistling as he went. This occurrence seems to have further engendered the animosity of deceased, and his ill will seems to have been particularly kindled against M. V. Phipps, the father of defendant. On the Saturday morning of the homicide, about 9 o'clock, deceased came into the store, and cursed and abused M. V. Phipps, using very vile epithets towards him, in presence of his son, and an altercation appears to have been occasioned. The parties became so boisterous that the sheriff came over and interfered, and at last succeeded in getting the deceased to leave the store. The deceased repeatedly said if M. V. Phipps would come out of the store he would wipe the earth up with him, and as he went out of the store with the sheriff he denounced the said Phipps, and told him when he got him out of town he would wear him out. Shortly after this, it appears that the justice of the peace in some way heard of the matter, and sent for the elder Phipps, and required him to make an affidavit against the deceased. The deceased was arrested by an officer on a warrant from the magistrate, and in the evening sometime succeeded in getting bond. After his release he went back to the store and began the row again, and accused M. V. Phipps of having him arrested. Phipps told him he had to do it, and deceased then said, "God damn you, I will beat hell out of you," and he told Phipps that he could whip the whole damn outfit. M. V. Phipps said, "Go on off, Mark. I don't want any trouble with you." Deceased then said, "No, damn you; you can't whip one side of me." Phipps said, "I know that, Mark; and I don't want to hurt you." About this time Sheriff Carnes came in, and told deceased to go off, and not to raise a racket, and took hold of him and carried him out. As he went out he denounced Phipps, and told him that if he would come out there he would wipe the sidewalk up with him. M. V. Phipps went to the door, and told deceased to go off. Carnes got

him on his horse.    When he got on his horse, deceased made a gesture as if to strike Phipps with his quirt.    Carnes caught hold of the bridle reins of deceased's horse, and told him if he did not go on off he would arrest him again.    As he went off he denounced Phipps.    Then one John Thompson made an affidavit against deceased for this disturbance, and another warrant was issued, and deceased was arrested. The officer took him in charge, but the officer explains that, as it was late and deceased's friends had gone home, on a promise of deceased that he would not bother Phipps any more, and go on home, he turned him loose without a bond, on his agreement to come back to the Justice Court Monday.    All this difficulty at the store occurred in the presence and hearing of defendant, Tom Phipps, but he took no part in same, and did not say anything.    M. V. Phipps is shown to have requested the sheriff to stay around the store for his protection, as he was afraid deceased would go off and arm himself, and come back, and do him damage.    The evidence shows that deceased was 20 years old, was 6 feet and 7 inches tall, weighed 204 pounds, was a strong, athletic man; that the defendant, M. V. Phipps, and his son, Tom, were men of ordinary size, weighing about 140 or 150 pounds.

After the deceased was released by the sheriff the last time on his own recognizance, it appears that Phipps and his son were informed of same, that they expressed apprehension that he would make a raid on them again, and that in anticipation thereof they armed themselves. As they expected, almost immediately after the release of deceased, he came to the store, came up in the door, and here the difficulty occurred which resulted in the homicide.    When the deceased came into the store, M. V. Phipps was sitting about midway the store, behind the stove, and his son was sitting about midway the store on the south of the counter.    When deceased came into the store, defendant, Tom Phipps, got off of the counter, and told deceased to go out of there. According to the testimony of a number of witnesses, he said, "What for?"    The defendant told him to go out, three times, and then pulled his pistol from his overcoat pocket, and fired, the ball entering the left breast of deceased, and penetrating his heart.    He ran out.    Defendant ran to the door in pursuit, and fired another shot at deceased after he was on the sidewalk.    Deceased ran forty or fifty feet and fell, and expired.    Some of the witnesses show that deceased was standing erect when the fatal shot was fired, while some show that his body was in the attitude of leaning forward towards the defendant, who was only a few feet from him; and this seems to be corroborated by the course of the ball, which, the evidence shows, entered in front on the left breast, between the third and fourth ribs, and came out on the right side about one and a half inches from the backbone, coming out between the ninth and tenth ribs.    Several of the witnesses stated, that at the time deceased stepped in the door and the defendant halted him, he had his hands run down under the waistband of his pants; some say in his pockets.    One witness (Thomas Horton) states, that when deceased

was halted in the door he had his hand on the side of his hip or in the waistband of his pants. None of the witnesses except the defendant show any further demonstration of the deceased prior to the shooting. The defendant himself relates the incidents immediately connected with the shooting, as follows: "Deceased came to the store door. He stopped with his toe on the doorsill. I said, 'Get out of here, Mark,' and he says, 'Where is that old shit-ass daddy of yourn?' I told him again to get out, and he threw his right hand towards his right hip, and, as he did so, leaned forward, and I fired." Charles Warden testified, that deceased told him that evening that he intended to get a club and beat hell out of old man Phipps. He advised him not to do it. Then he said he was going to get a beer bottle and knock Tom Phipps in the head with it, and then beat hell out of the old man. And after the killing, on deceased's body, the witness found in the hip pocket of deceased a pint bottle filled with beer. This witness also stated, that he got some cartridges for the deceased that evening. This is a sufficient relation of the facts to show the bearing of such assignments of appellant as we deem worthy of notice.

The appellant in this case made an application for a continuance of the cause on account of the absence of the witness Bob Linebarger, who was alleged to reside in Childress County. He charges: That he used due diligence to ascertain all the witnesses present at the time who knew anything about the case, and that he did not ascertain until late Saturday evening, the 23rd of March, 1895, that Linebarger was present at the difficulty, and did not know what his testimony was until the next day, March 24, 1895. That was Sunday, and he could not get an attachment until Monday, the 25th, which he did for said witness. That by said witness he expected to prove, that when deceased first came to defendant's store defendant ordered him to get out. That at said time deceased had his hands down between his body and waistband of his pants, and that deceased said, "What for?" and just immediately after said remark drew his hand out of his waistband, and put it to his side, a little in front of him; and defendant again ordered him out of his house, and in reply to the second order deceased said, "Where is that old shit-ass father of yours?" That defendant ordered deceased out the third time, and that immediately thereafter deceased leaned his body forward, and moved his right hand towards his hip as if to reach for and draw a pistol, and that at the time deceased had a beer bottle in his hip pocket, the neck of which was covered with tin foil, and resembled a pistol in appearance; and that when deceased leaned forward and threw his right hand towards his hip pocket defendant drew his pistol out of his overcoat pocket, and at once fired the fatal shot which caused the death of deceased. And that no other witness could testify to the same facts except M. V. Phipps, who was not a competent witness. This application of defendant was overruled, and he took a bill of exceptions to same, and now assigns this action of the court as error. In our opinion, the dili-

gence shown was sufficient, and, under the circumstances of this case, the evidence was very material.. It is true, if we refer to the statement of facts, that several of the witnesses say that they did not see Linebarger there, but it appears that at the time there was a great deal of excitement, that there were a number of persons in the store, and that they all immediately ran out when the difficulty began. So we see nothing unreasonable in the statement that Linebarger was there, and may have seen what was alleged. As stated before, all of the witnesses who were in the store when the difficulty began ran out, and evidently much of what they saw occurred while they were in the act of running, and while they were outside of the store, and getting out of the way. The only witness who testifies to these particular demonstrations is the defendant himself, and the jury might not be disposed to lend credit to his statement, though it is not gainsaid by other witnesses, except in a negative way; and, if this testimony was calculated to corroborate the statement of the defendant himself, under the circumstances of this case, it certainly would have been very valuable to him, and the court should have awarded him an opportunity to procure same by continuing the cause until next term of the court.

The State was also permitted to prove in this case, over objections of defendant, that the deceased had a habit of putting his hands down in the waistband of his pants, and leaning forward; and one witness, who did not seem to know his habit, stated he had seen him in that attitude two or three times. The evidence does not show that defendant was conversant with this reputation of deceased, much less that he knew of the two or three occasions when the deceased had occupied that attitude, and we do not believe the testimony was admissible.

The court gave a charge in this case on self-defense, which is as follows: "A reasonable apprehension or fear of death or serious bodily injury will excuse a party in using all such force as is necessary to protect his life or person or the life or person of another. If, from the evidence in this case, you believe that defendant did shoot and kill the said Mark Luttrell, but further believe from the evidence, that at the time of such killing the said Mark Luttrell had made an attack on the defendant or on M. V. Phipps of such a character as to put the defendant or M. V. Phipps in danger of death or serious bodily injury, which from the manner and character of it, and the relative strength of the parties, and the defendant's knowledge of the character and disposition of the said Luttrell, caused the defendant to have a reasonable fear or expectation of death or serious bodily injury to himself or to M. V. Phipps, and that, acting under such reasonable expectation or fear, the defendant killed the said Mark Luttrell, you will acquit the defendant." It will be noted that this charge bases the defendant's right to act in his self-defense on the theory that deceased, Luttrell, had made an attack on the defendant or on M. V. Phipps, of such a character, etc. And the question which presents itself for our consideration is, was this a proper charge under the proof presenting the

issue of self-defense in this case? Webster defines an "attack" to mean "to fall upon with force; to assault, as with force of arms; to assault;" and in common understanding, such is the meaning of the term. The evidence in this case, to our minds, indicates not an actual attack, but an immediate preparation for such attack—that is, that the deceased was then about to undertake an attack or assault on the defendant or on his father; and in such a case we do not understand that the law of self-defense would require the defendant to wait until the actual assault should be made. He had a right to act upon the appearance of danger as it presented itself to him at the time; and, if it reasonably appeared to him, from what had previously transpired between the defendant and his father during the day, that the deceased had come there for the purpose of raising a difficulty with his father or with himself, he had a right to request him to leave, and if deceased refused to leave, and then by his attitude it reasonably appeared to defendant that he was then about to make an assault upon himself or his father, in such a manner as to put him in fear of life or bodily injury to either, he had a right to strike, and strike quickly; and there is no law that would compel him to wait until his adversary had drawn a pistol, and had actually made an assault upon him. The charge in question, in our opinion, curtailed in a material manner the defendant's rights, under the circumstances of this case, and this error is nowhere remedied, if it could have been, in any subsequent portion of the charge; and, though it might have been ameliorated in some degree by charges asked on the part of the defendant, these were refused. For the error of the court in giving the charge heretofore set out, if for no other, this cause should be reversed.

There are other questions raised in the appellant's assignments of error, which we deem it unnecessary to notice.

For the errors pointed out, this case is reversed and remanded.

*Reversed and remanded.*

Judges all present and concurring.