## JOHN A. DYER v. THE STATE.

No. 3027. Decided November 16, 1904.

**1.—Murder in Second Degree—Practice—Bill of Exceptions—Explanations— Supporting Affidavits.**

While it is competent for a judge to make proper explanations to bills of exception, where these matters do not appear in the record, but are ascertained by the judge from extraneous sources, in connection therewith he should file affidavits supporting his statement, and full opportunity should then be afforded appellant to controvert the sources of his information.

**2.—Same—Continuance—Inferences of Judge.**

Where the judge appears to have certified that the absent witness could not have been sick as stated in the application for continuance, which statement he appears to have derived from an inference that this same witness was able on the next day after the trial to ride four miles and make an affidavit, and it appeared from said affidavit that it was made four days after the application for continuance was presented and acted upon, the basis of such inference is in a measure

destroyed even if the judge were warranted to draw the same, and it was error on his part to assume that the affidavit to the application was false and that the defendant's attorneys could have had the witness in court.

**3.—Same—Diligence—Inference of Judge Not Born out by Record.**

Where the application for continuance set out the fact that the absent witness had been duly served with a subpœna, that he lived twelve miles from the county seat in the county of the trial, that he was unable to attend on account of being sick; which application was supported by the affidavit of a practicing physician, stating that the witness was confined at the time to his bed by a severe sickness, and that he was unable to attend court during the week, sufficient diligence is shown and the application should have been granted, regardless of the inferences of the judge that the witness was not sick, that the physician was a partisan of defendant and that the defendant's attorneys preferred the point overruling the application to the testimony of the witness; which inference was unwarranted in the face of the record.

**4.—Same—Materiality of Testimony.**

Where the application for continuance showed that the testimony of State's witness would be that defendant had stated a short while after the homicide that he killed deceased because he wanted to, that he would do so again if he had to do it over and that deceased had been telling lies on him, and the application further showed that the testimony of the absent witness would show that the latter was present during all the time on the occasion the above statement of defendant should have been made and that it was not made, traversing each of the above alleged declarations, there was reversible error, especially as the said State's witness did testify substantially as set out in the motion for continuance.

**5.—Evidence—Opinion of Witness Inadmissible.**

Where a State's witness on cross-examination stated that he heard an expression from defendant, immediately after the homicide, that he was sorry he had it to do, but deceased would have killed him with the axe that witness saw at the time of the killing, if defendant had not killed him, it was error to permit the State to introduce a witness in rebuttal who testified that said first witness gave no such testimony on the examining trial, and that he knew he did not because as he stated, "I remembered very distinctly about that part of his testimony, and it made an impression on my mind because it was so unreasonable."

**6.—Same—Res Gestae.**

Testimony of a State's witness, as to what occurred between him and appellant, some fifteen minutes after the homicide was admissible, the same referring directly to the same.

**7.—Same—Charge of the Court—Self-Defense—Requested Charge—Grouping Facts.**

Where the court charged the jury that the defendant had a right to act on the appearance of danger, as well as on actual danger, to be judged from his standpoint at the time and that if deceased at the time of the homicide had made an attack on him with an axe, etc., which caused him to have reasonable expectation or fear of death or serious bodily injury, and under such circumstances he killed deceased, they should acquit, it was not error to refuse a requested charge grouping all the facts as detailed by defendant and his witnesses concerning his action at the time of the homicide. Distinguishing Hjerronymus v. State, 9 Texas Ct. Rep., 805; McVey v. State, 81 S. W. Rep., 740.

Appeal from the District Court of Franklin. Tried below before Hon. P. A. Turner.

Appeal from a conviction of murder in the second degree; penalty ten years imprisonment in the penitentiary.

The testimony of the principal witnesses is substantially as follows: Mrs. Lank Elliott testified that she saw the deceased, Demp Bruce, at her house on the night of the homicide. He lived about 175 steps from

witness' house, and came there with his wife early that evening to stay all night. It was supper time. While they were there, witness saw defendant and two other boys ride horseback by her place in a lope in the direction of Will Pike's house, about a mile from witness' house. The deceased, witness' husband, and Mr. Hightower were out on the gallery, and witness and the wife of deceased were standing in the door as these boys passed the house and hollowed; they were passing within twenty-five or thirty steps from the gate. After an hour, or such matter, these boys returned to witness' house; but just before their return, the deceased had started home to turn his dog loose, to keep him from growling. He was somewhere between the door and the gate when these boys got back to the house, and witness heard them hollow. The night was bright and it was about 8 or 9 o'clock and moonlight.

The boys all remained on their horses, except the defendant, who dismounted. By this time, deceased had had time to get somewhere about half-way to his home. There was something said about where Bruce, the deceased, was. Jess Creasy, one of the three boys, said something about it, saying Bruce was down the road, addressing the defendant, who then stopped approaching witness' house and said, "Where is Demp," and Jesse said, "Down the road." The defendant then hollowed, "Where are you Demp Bruce!" Witness did not hear any reply, but defendant said, "I didn't know you," and turned and got his horse and started off leading him, going towards Bruce's house.

After the boys left the witness heard some loud talking down there about Bruce's house, but could not understand what was said, only she heard the word, "damn." "I heard Bruce hollow and call his wife; he just said, 'Oh, Lida!' I told my husband to answer him and he hollowed and asked him what he wanted, and he made no answer. We all went down there and found him lying at the gate and it looked like he was cut all to pieces. He lived somewhere about an hour. I saw where there had been some trouble. I saw blood all in front of the gate and on the north side of it. He knew everything, I reckon, from the way he talked. When his wife come up to straighten his feet out and asked him if he was dead, he said that he was not dead, but was cut plum to the hollow. His wife said, 'Who cut you Demps?' and he said, 'Johnny Dyer,' and commenced to tell us he was freezing and wanted to go into the house, and then he said, 'Lida, I am just about gone; bless the Lord, praise the Lord,' or something like that. I had been down at Bruce's that evening about sundown and he was making a gate. He had his axe and was chopping a piece on a stump. I saw the axe that night. When I saw the axe that night, it was by the side of the fence, on the south side of the gate, about four feet from it. I looked at it closely that night, I thought Bruce had been killed with it, but I could see no blood on it; it was standing straight up against the fence, just like he had come in from his work and set it there. There was no blood on the handle of the axe or on the axe, and none near the axe on the ground. All the blood I saw was mostly in front and north

of the gate. The axe was on the outside of the gate, and Bruce was chopping with it that evening on the outside when I was there that evening."

The witness Jesse Creasy testified pretty much the same as the above witness and then described the difficulty as follows: "The defendant walked from Elliott's on down to Bruce's and led his horse. He was going to Bruce to give him a drink of liquor, he said that was what he was going for. We all three went down there. When we got there, Bruce was on the outside, right close to the gate, and he and the defendant had a fight. The defendant left the big road and went up towards the gate, up where Mr. Bruce was. He walked right up to him, I reckon, but I never noticed him at first. I was off about twenty feet from him, I reckon, and Dan Carpenter was along there right at me. We were not quite even with Bruce's gate. Bruce was standing kind of southeast, about four feet from the gate. I did not hear defendant say anything to Bruce when he turned out of the road and went to where he was. He just led his horse on up there and turned it loose. I don't know whether defendant gave deceased a drink of whisky or not, and I never saw him offer him any. The first I saw of them they were fighting there. As soon as I noticed them I jumped off my horse and went up to them. Carpenter went also. When I got there I caught hold of John Dyer (defendant) to stop him. Carpenter also caught hold of him. When we caught hold of him, he was striking Bruce as we went up. He had hold of Bruce and was striking at him. He had him up here in some way, holding him by the lapel of the coat, and was striking him with his right hand. When I got up to them, Bruce was standing with his arm up this way, and he seemed to be trying to push or knock him back. One of Bruce's arms was cut in the fight, and I think it was his right one. Bruce did not have anything in his hand that I saw. I did not see anything of an axe when I went up there, but when I turned to start off, there was one laying right out by the side where I went up to them. I never saw Bruce with the axe in his hand during the difficulty. I know he did not have it when I went up there."

On cross-examination this witness stated, that he never heard Bruce says that he did not want Dyer's damned whisky; did not hear the word, "damn." Carpenter said to Dyer, "Demps is calling you." When we pulled John Dyer back I heard him say something about his cutting Bruce, but I can't tell what he spoke exactly; he said he was sorry he had to do it, but he had to do it, and brought in the axe some way. I think he said that Bruce would have killed him with the axe or hurt him. This witness also stated that the defendant had a bottle of alcohol and that he drank pretty freely out of it, as did the other two.

Dan Carpenter, the other person who was an eye witness to the homicide, corroborated the statement of Jesse Creasy, with reference to their being with defendant the night of the homicide, drinking together and riding down to Pikes to attend a dance, which however did not take place; of going back to Elliott's house, etc. He also stated that when

they got there he heard Bruce call defendant, saying, "Johnny," that defendant did not pay any attention to him, until, witness said, that Bruce had called him, then he listened and said, "Where are you," and Bruce said, "Here I am;" and that they then went on down there. Witness did not remember whether defendant said anything about treating Bruce to some whisky, but that he heard deceased say when Bruce got there, that he did not want any of his damned whisky. "I looked at them then. Bruce struck at Dyer with an axe, and the axe went right down by his left side. Dyer just stepped to one side and grabbed at the axe. The fight did not last any time. * * * I saw the axe afterwards, it was lying down there where they had the fight." This witness also stated that defendant said he hated to do it, but that deceased would have killed him with the axe, and he had it to do. This witness was positive that Bruce had the axe and struck with it at Dyer.

Defendant testified, stating that he and the other two boys were together the night of the homicide; that they had a bottle of mixed alcohol with them, of which they drank; that they started together to Pikes to attend a dance, but the dance having been postponed, they returned and stopped at Elliott's house, and that then matters transpired as Carpenter and Creasy told them; that he went up to Bruce offering him a drink out of his bottle, when Bruce said he did not want his damned whisky, and that he would knock his damned brains out, picking up the axe and striking with it at defendant; that defendant caught at the axe with his left hand and began cutting deceased. Defendant also testified that the deceased and he were on friendly terms, although other witnesses testified that the deceased had said that if defendant did not stop running by his house hollowing, he would stop him or kill him, but this statement it seems, was not communicated to defendant, and he felt quite friendly towards deceased. A great many witnesses were introduced on both sides, and the testimony is quite voluminous; but the above statement, together with the facts as stated in the opinion, elucidate the issues in the case.

*Glass, Estes & King, Ralston & Ward* and *R. E. Davenport,* for appellant.—Appellant sought a continuance in order to procure the testimony of James Dyer, by which he expected to, and would have proven that he was present and heard all of the conversation between Albert Ottinger and the appellant, at the time Ottinger testified about, and that the killing of Demps Bruce was not mentioned at all; and that the appellant did not tell said witness, Albert Ottinger, that he killed Demps Bruce because he wanted to, or that he would do it over again, or that Bruce had told lies on him. Phipps v. State, 34 Texas Crim. Rep., 560; Donahoe v. State, 28 Texas Crim. App., 12; Massey v. State, 40 S. W. Rep., 726; Hardin v. State, 49 S. W. Rep., 607. If an issue had been made on the question of whether or not Jim Dyer was sick, or whether or not he was able to go to court, appellant could, and would have met it in open court; and it is not fair that his rights should be

jeopardized by tale bearers and ex parte statements made outside of. the court. The charge that his presence was not wanted, and that we could have had him at court if we wanted him there, is a serious one,—reflecting not only upon appellant, but on his attorneys as well, and it is not fair that such charge be taken as proof on hearsay testimony,—the source of which has never been disclosed to us, and which we unhesitatingly assert could, and would have been disproved by overwhelming testimony, if the same had been made in court.

The affidavit of the attorneys who tried this case shows that the affidavit of the witness, Jim Dyer, which is attached in the record was not made until the 13th day of May, 1904, four days after the trial, and while it was not attached to the motion for a new trial, the same was handed to the district attorney who read it in court, and the same was read aloud in court to the judge. Wallace v. State, 10 Texas Ct. Rep., 915.

*Howard Martin*, Assistant Attorney-General, for the State.

HENDERSON, Judge.—Appellant was convicted of murder in the second degree, and his punishment assessed at ten years confinement in the penitentiary.

Appellant made a motion to continue the case on account of the absence of James Dyer, for whom a subpœna had previously been issued and served. As to the failure of said witness to appear, the affidavit shows he was not able to attend on account of being sick; that he lived in Franklin County, twelve miles north of the county-seat. Reference is made to the affidavit of Dr. Davis. This affidavit shows that affiant is a regular practicing physician in the county, and is acquainted with the witness James Dyer, and says he knows said witness is confined to his bed by a severe sickness, and he is at his home about twelve milee north of Mount Vernon, Franklin County, and is unable on account of such serious sickness to attend court at Mount Vernon during said week. The court explains this bill as to the diligence used, as follows: "Said Dyer is a first cousin of the defendant; and Dr. Davis, the attending physician is a partisan in behalf of the defendant; that said physician gave a certificate that Jim Dyer and his wife, Mrs. W. O. Rogers and Will Pike were all sick and unable to attend as witnesses in the case; that all said witnesses attended court and were not sick; that Jim Dyer, while a little sick, was able to attend and testify, if he had been wanted; that the next day after the trial, Jim Dyer rode four miles to make affidavit before justice of the peace, to be attached to the motion for new trial. His affidavit was handed to the attorneys for the defendant, and they declined to attach said affidavit to their motion for new trial. In the opinion of the judge, defendant preferred the point overruling the application for continuance, to the evidence of the witness. His evidence could have been had if defendant had wanted it. When the motion for new trial was acted on, defendant's attorneys had

Jim Dyer's affidavit, and declined to annex it to their motion." Appellant and his attorneys reply to this explanation of the court, to the effect: that said explanation was made to the bill of exceptions "ex parte" by the judge, and without any accompanying affidavits to support the same, and was made thereto without the knowledge and consent of appellant, and after the adjournment of the court, when they had no opportunity to controvert the same; that if they had been afforded an opportunity they would have shown the facts to be different than as stated by the judge. It is further shown in the affidavit that instead of the witness being able to ride some four miles and make the affidavit on the day after the trial, it was four days thereafter before he rode to the justice of the peace in a buggy and made the affidavit. Appellant's attorneys further explain that they had the affidavit of said witness at the time the motion for new trial was acted on, but they did not see fit to file the same with the application; but afforded State's counsel an opportunity to inspect the affidavit, which was read to the court. They further complain that the ex parte statement of the judge was calculated to reflect on their professional integrity, and they should have been afforded an opportunity to meet the allegations therein. While it is competent for a judge to make proper explanations to bills of exceptions, where these matters do not appear in the record but are ascertained by the judge from extraneous sources, in connection therewith, he should file affidavits supporting his statement, and full opportunity should then be afforded appellant to controvert the sources of his information. Even if the fact existed within the knowledge of the court, he could not state the same without accompanying it by his affidavit, unless such fact appeared some way of record. Here, the judge appears to have certified that the witness could not have been sick as stated in the application, which he appears to have derived from an inference that this same witness was able on the next day after the trial to ride four miles and make an affidavit. This deduction of the court might be true, and yet it might be true that at the time the affidavit for continuance was made, the witness was not able to attend court. But when we find from the date of the affidavit itself that it was made four days after the application for continuance was presented and acted on, the basis of the inference of the judge appears to have been in a measure destroyed, even if he were authorized to draw the deduction assumed by him in this case. We do not believe the judge was warranted in his inference that the affidavit made for the continuance was false, much less was he authorized to infer that the attorneys could have had the evidence present, in court if they had wanted it. It occurs to us that the diligence used to procure this testimony was adequate. Richardson v. State, 28 Texas Crim. App., 216. Was the testimony of the absent witness material? It was shown in the application that one Ottinger, who was a State's witness, would testify that on a certain occasion, a short while after the homicide, he had a conversation with defendant, in which defendant stated to him, that he killed deceased because he wanted to, and would do it again if it

was to do over; and cursed him and said he killed him because he had·
been telling lies on him.   This witness Ottinger was present at the trial
and did testify as alleged, and this was a most material fact in favor of
the State, suggesting malice on the part of the defendant in the killing.
The time when this occurred is not definitely stated by this witness, nor
is the time definitely fixed by appellant's absent witness.  But both wit-
nesses concur that there was but the one conversation at the particular
place when this statement should have been made.  So, we take it, that
the occasion is sufficiently definite, and the only point of difference be-
tween the State's witness Ottinger and appellant's absent witness is, that
Ottinger says the conversation occurred with reference to the homicide
before the witness Jim Dyer came up, while the application shows that
Jim Dyer was present all the time during the interview between appel-
lant and the witness Ottinger.  The application shows that this absent
witness Jim Dyer would testify that he was present during all the time,
and that no such statement was made as that testified to by the State's
witness Ottinger.  As previously stated, this was a most material fact,
indicating malice on the part of appellant, and appellant certainly had
the right to rebut this by any legal testimony he could adduce.  The tes-
timony of the absent witness, though of a negative character, effectually
contradicted the evidence of the State's witness on this point.  Appellant
had the right to avail himself of the evidence of this witness, in order
that the jury might pass on the truthfulnes of the testimony of the wit-
ness Ottinger against him.  Wallace v. State, 81 S. W. Rep. 966, 10
Texas Ct. Rep., 915; Phipps v. State, 34 Texas Crim. Rep., 560; Don-
ohue v. State, 28 Texas Crim. App. 12; Hardin v. State, 49 S. W. Rep.,
607.

Appellant also complains of the action of the court in permitting the
witness Holbrook to testify as to an impression produced on his mind by
the testimony of Jesse Creasy at the examining trial.  It seems, that
Jesse Creasy was introduced as a witness on this trial by the State, and
on the cross-examination appellant drew out of him that he saw an axe
at the time the homicide was committed; that he heard an expression
from appellant, immediately after the homicide, that he was sorry he
had it to do but deceased would have killed him with that axe if he had
not done it.  This evidence, it seems, did not appear from this witness at
the examining trial, but was drawn out by appellant, for the first time,
on the cross-examination of said witness in this trial.  The State used
the examining trial testimony in some way to contradict witness Creasy;
and in that connection used the justice of the peace Holbrook, who tes-
tified that Creasy gave no such testimony on the examining trial, and
that he knew he did not, because, as he stated, "I remember very dis-
tinctly about that part of his testimony, and it made an impression on
my mind, because it was so unreasonable."  This portion of the witness'
testimony was excepted to by appellant on the ground that it called for
the opinion of the witness, and that it was not competent for him to
give the reasons why he remembered it.  The court has appended an

explanation to this bill, but it does not appear to afford any reason for the admission of the statement. It is sometimes permissible for a witness to refresh his memory; or to state some extraneous fact which caused the particular matter inquired about to be impressed on his memory, but in all such cases it will be found that the matter referred to was of an immaterial character, and could not prejudice appellant as to any material matter in the case. But here, it seems the reason offered by the justice of the peace Holbrook was a direct reflection on the integrity of the witness. This witness, although a State's witness, testified to a material fact for the defendant which he had not testified to on the examining trial; and the effect of the testimony of the justice of the peace was to impeach him as to that matter; and the justice of the peace, in that connection, is made to pass judgment on the credibility of that witness' testimony as to its being unreasonable. We do not believe this opinion of the witness was admissible.

We believe the testimony of the witness C. W. White as to what occurred between him and appellant, some fifteen minutes after the homicide, was admissible. Evidently, some portion of that testimony had direct reference to the homicide he had recently committed.

In the motion for new trial, appellant complains of the refusal of the court to give his special requested instruction on self-defense. The gravamen of his contention is that the court should have grouped all of the facts, as detailed by appellant and his witness concerning his action at the time of the homicide. We have examined the court's charge on self-defense, and do not believe it was necessary to give the requested instruction. The cases of Hjerronymous v. State, 9 Texas Ct. Rep., 805, and McVey v. State, 81 S. W. Rep., 740, have no application here. The court instructed the jury distinctly that appellant had the right to act on the appearances of danger, as well as on actual danger, to be judged from his standpoint at the time, and then told the jury further that, if they believed defendant killed deceased, but that at the time of so doing deceased had made an attack on him with an axe, etc., which caused him to have reasonable expectation or fear of death or serious bodily injury, and under such circumstances he killed deceased, they should acquit him. This, in our opinion, was a sufficient presentation of the law of self-defense applicable to the facts of this case, and it did not become necessary for the court to tell the jury that appellant had the right to approach deceased and ask him to take a drink, etc., as appears in the requested instruction.

No charge was requested and no exception reserved to the refusal of the court to instruct the jury under the statute with reference to homicide committed under the influence of insanity produced by the recent use of intoxicating liquor. Of course, appellant could not avail himself of the failure to charge on that subject in this condition of the record. However, if the testimony on another trial should be the same as is here presented, it might be well for the court to submit that matter to the jury.

We do not deem it necessary to notice the other assignments of error; but for the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*