RUBE PAYTON v. THE STATE.

No. 764. Decided November 16, 1910.

Rehearing Denied, December 9, 1910.

**1.—Murder—Charge of Court—Self-Defense—Threatened Attack.**

Where, upon trial of murder, the evidence showed that the deceased made a threat against the defendant, grabbed a knife and lunged forward toward the defendant, this was an actual attack and not a threatened attack, and there was no error in the court's failure to submit a charge on threatened attack.

**2.—Same—Charge of Court—Defendant's Standpoint—Self-Defense.**

Upon trial of murder, where the court submitted in his charge on self-defense that the acts and conduct of deceased at the time of the killing, in order to justify the defendant on the grounds of threats, must be such as to raise in his mind a reasonable appearance from his standpoint that the deceased was about to carry the threat into execution, there was no reversible error although the expression "reasonably" should have been omitted.

**3.—Same—Defendant's Standpoint—Charge of Court.**

Where, upon trial of murder, the court in his charge had already told the jury that in determining the rights of defendant to act in self-defense the matter must be viewed from the defendant's standpoint at the time of the killing, there was no error in not repeating this caution in every paragraph of the court's charge.

**4.—Same—Evidence—Defendant as a Witness.**

Where, upon trial of murder, the State was permitted to recall the defendant as a witness and ask him whether he had not been drinking on the night of the killing, which he denied, whereupon the State was permitted to introduce another witness who testified that in about thirty minutes after the killing the witness met the defendant whose breath smelt strong of whisky, there was no reversible error, although the court in his charge limited this testimony to the credibility of the defendant, and which although improper was not reversible error.

Appeal from the District Court of Taylor. Tried below before the Hon. Thomas L. Blanton.

Appeal from a conviction of murder in the second degree; penalty, seven years imprisonment in the penitentiary.

The opinion states the case.

*J. M. Wagstaff* and *Cunningham & Sewell,* for appellant.—On the question of admitting evidence that defendant was drinking and limiting said testimony to the credibility of witness: Thompson v. State, 29 Texas Crim. Rep., 208, 15 S. W. Rep., 206; Sherar v. State, 30 Texas Crim. App., 349, 17 S. W. Rep., 621; Ferrell v. State, 43 Texas, 503; Huffman v. State, 28 Texas Crim. App., 174, 12 S. W. Rep., 588; Quintana v. State, 29 Texas Crim. App., 401, 16 S. W. Rep., 258.

On question of court's charge on actual and threatened attack: Lockhart v. State, 53 Texas Crim. Rep., 589, 111 S. W. Rep., 1024; Alexander v. State, 25 Texas Crim. App., 260; Gonzales v. State, 28 Texas Crim. App., 130; Boddy v. State, 14 Texas Crim. App., 528; Phipps v. State, 34 Texas Crim. Rep., 560, 31 S. W. Rep., 397; Stewart v. State, 40 Texas Crim. Rep., 649, 51 S. W. Rep., 907; Gafford v. State, 99 S. W. Rep., 998; Poole v. State, 45 Texas Crim. Rep., 348, 76 S. W. Rep., 569; Brady v. State, 65 S. W. Rep., 521.

On question of defendant's standpoint on charge of self-defense: Watson v. State, 50 Texas Crim. Rep., 171, 95 S. W. Rep., 115.

*John A. Mobley,* Assistant Attorney-General, for the State.

McCORD, Judge.—This is an appeal from a conviction for murder in the second degree with a penalty of seven years.

An indictment was returned in the District Court of Taylor County at the February term, 1910, charging the appellant with the murder of one S. C. Hackley, and appellant being brought to trial resulted in his conviction as aforesaid. The evidence develops that the deceased Hackley was running a boarding-house in the town of Abilene; that he was a man some seventy years of age; that his family consisted of his wife and his stepdaughter; that the defendant was his brother-in-law, being the brother of his wife, and lived with the family of the deceased; that defendant was a man about sixty-five years of age; that he had been living with the family of deceased ten or twelve years; that on the night of the difficulty the first thing that was noticed the defendant came out of his room, which opened into the dining-room near or about the west end of the dining-room table, and this table extended east and west and was something near sixteen feet long; that this room was on the north side of the dining-room, and the defendant, after he reached near the table, placed his hand in a glass jar and took out a cracker; that the deceased was on the south side of the table about half way, and looking up stated to the defendant, "What are you looking at me so hard for?" Defendant replied, "What are you looking at me for?" That the deceased became enraged and commenced cursing defendant; that defendant cursed back and started toward the east end of the table to go out of the door, which was near the east end of the table; that deceased advanced up to the east end of the table with his sleeves

rolled up; that when the defendant got about the end of the table, the deceased also being at that end, having advanced from the center portion of the table, defendant fired upon him resulting in his death. It seems that the deceased usually sat at the east end of the table and did the carving, and at that end of the table there was a butcher-knife and a carving-knife. The defendant had already eaten his supper and, as he says, started out of the door for the purpose of paying a visit to a friend. The contention of the State was that the defendant was the aggressor, brought on the difficulty and that his killing of deceased was without excuse or cause and at a time when he was not in danger, either real or apparent. On the trial of the case Miss Maude Hill, who was the stepdaughter of the deceased, and the niece of the defendant, testified substantially as follows: That she was at home the night the deceased was killed; that she had just finished her supper and gone into the kitchen, which opened in from the dining-room near the southwest corner of the table, and was there preparing a lunch to be sent to a sick lady; that her attention was attracted back to the dining-room, and she says: "I heard them quarreling." That she then went into the dining-room and the deceased and defendant were using loud, bad language; that her uncle, the defendant, spoke so low that she could not hear him well, but that her hearing was not good. Continuing, this witness says: "About the first thing I remember was deceased says, 'What are you looking at me for?' As well as I remember my uncle said, 'What are you looking at me for?' That is all I remember hearing my uncle say at all. Deceased said, 'I will look where I damn please,' and when Taylor came into the dining-room mama says, 'Uncle Tobe, won't you help me separate these men? There is going to be trouble here.' He got his drink and put the cup behind the cooler and walked out of the room and shut the door. He did not enter the room any more, and I took hold of my father's sleeve. Along before that I began begging them and appealing to them to hush. I says, 'Papa, won't you hush? Uncle Rube, won't you hush?' I says, 'Papa, please hush,' and they kept on talking and I took hold of papa's sleeve. He slung me back; he says, 'Take care; get out of my way; if he doesn't get out of the house I will kill him.' I went back into the kitchen and my mother came around between them, but if he ever touched my mother, however, I don't know it, because I went back in the kitchen and was not in the dining-room any more until after my father grabbed mother and throwed her back against the door facing and she staggered around into the kitchen against the cook-table. When she staggered back against the cook-table I went back into the dining-room, and my father by that time had advanced nearly to the end of the table—to the corner of the table—and I took my left hand and placed it around his waist and took hold of his right sleeve, and he was reaching and grasping for the end of the table and tried to pull around the table and

reached toward Uncle Rube and talking as loud as he could, and in about two minutes after I took hold of him the shots were fired; there were three shots, two of them as fast as they could be and then another one; and when the third one was fired he gradually fell. The shots were all fired before he hit the floor." The defendant took the stand and testified, among other things, as follows: "I had eaten my supper. Hackley kept boarders; it was a boarding-house; they just used one table that night; all the boarders did not eat at the same time; they eat as they came in; sometimes there was more than a table full and sometimes not. After I ate my supper I first went back around to my room on the north side. My room was located right back, it was the northeast room in the house on the ground floor. I had an engagement that night; I had an engagement to go down to Sy Campbell's that night. . . . He lived down here in the southeast part of town. . . . I had started down to Mr. Campbell's. I came out of my door on the north side to come right through the dining-room like I always come. That was my regular way to go whenever I go on the south side of town or that way, I always come through the dining-room. . . . There was more than one exit to get out of the dining-room. There was a door coming in from my room on the north side and come around the end of the dining-table in the dining-room, and right here there is a door goes out on the south gallery. . . . There was also a door down at the east end of the dining-room through which you could get out, by going through the kitchen. I came into the dining-room there. Mr. Hackley was the first man I met when I came in at the dining-room door. Mrs. Hackley was down at the east end of the table, sitting at the table, eating. There was no one in there then eating supper. . . . She was sitting down in a chair. I came into the dining-room on the north side of the table and there was a jar of crackers on the table, and I just reached over and picked up a couple of crackers and commenced eating them; there was a jar of crackers sitting on that end of the table. I had been in the habit of doing that; I suppose that table was two and a half feet wide. It was just about as wide as this table here; I think it was sixteen feet long. I do not know about how large the dining-room is in which the table is located. Down at the east end of the room there is just room for —well, I suppose it is two and a half or three feet from the end of the table to the wall and it is a little more than that at the west end. When I came into the dining-room there and took that cracker and began to eat the cracker Hackley asked me what I was looking at him so hard for. I had just picked up the cracker and looked right in his face, and he says, 'What in the hell are you looking at me so hard for?' I just walked in and picked up the cracker and looked at him like I would anybody else. He was standing on the opposite side of the table. I was not expecting any trouble—none on earth. He says, 'What in the hell are you looking at me so hard

for?' I says, 'Nothing.' I says, 'Why, what are you looking at me for?' and he replied and said, 'It is none of your damned business.' It seemed that he was sorter mad about something. When I came into the dining-room I intended to go right on through. I was intending to go on out the south door of the dining-room. In order to have gone out the south door I would have had to come right around the end of the table where Mr. Hackley was. After this conversation with Mr. Hackley, and these remarks, I did not go around the west end of the table. I went right down on the north side of the table. I didn't go around the west end of the table because I seen that he was right along where I had to pass, and I could not get by without running square up against him, and I seen he was mad about something, and I didn't want to. I went right down on the north side of the table towards the kitchen, walking down that way. I was going right out the kitchen door. That is what I was aiming to do; just go right on around the east end of the table and out the kitchen door. . . . We went right down the side of the table quarreling and him cursing and I was jawing back at him. The first thing, he asked me what I was looking at him so damn hard for. 'I says, 'Nothing.' I says, 'What are you looking at me for?' and he says, 'None of your damned business.' He says, 'You get out of here, God-damn you, or I will kick you out of here.' I just remarked, I says, 'I don't have to get out of here; I will get out when I get ready.' He says, 'You get out, and that damn quick; if you don't, I will kill you;' and I kept on going right down the table—just walking along with my hand on the table. I don't know that I could repeat everything that was said. He cursed me two or three times. He called me a damned, low-down, dirty, son-of-a-bitch, and I says, 'What are you?' I says, 'You ain't no better than I am.' I says, 'You are just about the same thing you are calling me,' and he come on down to the end of the table. Mrs. Hackley raised up— we were cursing each other—and she raised up and stopped him, and when he got right close to the end of the table she got up out of the chair and she says, 'You all stop that fussing in here,' and I was back about four feet from where she was, at the end of the table, and she got up out of her seat and pushed him back this way; as he was coming down she pushed him back and he pushed back by her. When she pushed him back he says, 'If you don't get out of here, God-damn you, I will kill you.' He got right up to the corner of the table, and the kitchen door was right opposite the corner of the table, and he give her a sling and he throwed her back in the kitchen; that was Mrs. Hackley that he gave the sling. He gave her a hard jerk that way and he says, 'You get out of my way,' and give her a jerk and throwed her back into the kitchen, and by that time I had gotten right down at the corner of the table on the north side, right at the northeast corner of the table. At that time Hackley was about two or three feet back between the kitchen door and

the table. He was a little east of the corner of the table. He gave Mrs. Hackley a hard sling and slung her back into the kitchen and came right back toward the corner of the table, and as he come he looked right at me with vengeance; just as he came to the table he grabbed at the knife and he says, 'I will cut your God-damn head off;' that is the very remark that he made, and I was right at the corner of the table and he was right about a foot from the table; just as he came up he grabbed the knife and he says, 'I will cut your God-damned head off,' and when he said that he grabbed the knife and as he said that, I shot him. I shot him three times. I shot him just as fast as I could pull the trigger. When I shot him he was coming right toward me. Well, he was right at me; as close as from me to Judge Mahaffey, standing right up; he just had his—had grabbed the knife that way and he says, 'I will cut your God-damned head off.' I do not know where I hit him. I do not know how many times I hit him. I just jerked the pistol out—right out that way and pulled the trigger three times." This is a sufficient recital of the testimony to make clear the points raised in the trial of the case. It, however, may be stated that there was testimony offered on the trial of the case that the deceased had made threats against the life of the defendant and that these threats had been communicated to the defendant.

On the trial of the case the court charged upon actual attack, but not upon threatened attack. The charge given by the court on this subject is as follows: "Every person is permitted by law to defend himself against any unlawful attack, or against what to him might reasonably appear to be an unlawful attack, reasonably threatening injury to his person, and is justified in using all force to defend himself which the circumstances reasonably indicate to be necessary; and homicide is justified by law when committed in defense of one's person against what to him reasonably appears to be an unlawful attack, made in such a manner as to produce a reasonable expectation or fear of death or some serious bodily injury; and a reasonable apprehension of death or serious bodily injury will excuse a party in using all force to protect his life or person which the circumstances reasonably indicate to be necessary, and it is not necessary that there should be an actual danger, provided he acted upon reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such case the party acting under real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant. And to determine whether or not there was reason to believe that danger did exist, the appearance must be viewed from the standpoint of the person who acted upon them, and from no other standpoint. Now, if you believe that the defendant shot and thereby killed the deceased, if he did so, but you should further believe that at the time he did so the deceased had made an unlawful attack upon the defendant with a knife, or if it then so reasonably

appeared to the defendant, and that it then and there reasonably appeared to the defendant that he was about to suffer death or serious bodily injury at the hands of the deceased, and that in lawful defense of himself he shot the deceased, then the defendant would be justified, and should you so believe, you would acquit the defendant. And in this connection you are charged that the defendant would have had the right to continue shooting as long as it reasonably appeared to him that danger existed."

In the motion for new trial complaint is made of the failure and omission of the court to charge the jury upon the subject of threatened attack, the contention being that the defendant had the same right to defend against a threatened attack as he would an actual attack. That this proposition is true will not be gainsaid, but does this case present a case of threatened attack, or was it an actual attack? It may be in some cases difficult to determine whether an attack is about to be made, and where the attack actually begins. We are, however, of opinion that the court below did not err in not charging upon a threatened attack. We think the facts as detailed above by the defendant and the young lady show an actual attack. The defendant and deceased were within three feet of each other; deceased lunges towards the defendant, grabs up a knife, and says: "I will cut your God-damn heart out." This, we think, brings the case clearly within the rule announced by Judge Hurt in the case of Boddy v. State, 14 Texas Crim. App., 528. In that case the facts are very much similar to those in this case. In that case the facts immediately surrounding the killing show "the deceased made a quick movement towards the defendant, at the same time reaching out his hand towards a butcher-knife, which lay on a table standing near, and defendant quickly drew his pistol and fired and deceased fell dead. Deceased was shot after he made the movement towards the knife, but before he had time to get it. It was a large butcher-knife, used for cutting meat and hacking steak." The court in his charge to the jury in that case stated, after defining self-defense, "Still it must be some act which is reasonably calculated to induce the belief and does induce the belief that the attack had then commenced to be then executed and not a mere act of preparation to attack." In criticising this charge the court says: "To come within this rule is it required that the party slain must have actual possession of the weapon with which the offense is to be committed? Could not an act be done though one of preparation which would show evidently an intent to commit the offense? Must, if a pistol be drawn, the adversary cock and present the same to constitute such an act? To term the act of reaching for the knife, under the circumstances attending it, a 'mere preparation,' is a perversion of language as understood in legal phraseology, and it was, by thus terming it, calculated to induce the belief that such act was not sufficient to

impress the defendant with reasonable apprehension of the loss of life, or of some serious bodily harm." And the court further says: "There was not a fact or a phantom of facts tending to show preparation by deceased, save that relating to the effort to seize the knife. What then was this charge most evidently calculated to do? Impress the jury with the belief that when Burns, the deceased, made a quick movement towards defendant, and reached towards the knife at the same time, he was only making preparation to bring on the attack." We are of opinion, therefore, that when the deceased made the remark he did, lunged towards the defendant, grabbed the knife, that the attack had then commenced. Counsel have cited the case of Phipps v. State, 34 Texas Crim. Rep., 560, in support of their contention, that the attack had not commenced, and that, therefore, he was entitled to a charge upon an attack about to be made. In the Phipps case, at the time the shot was fired the defendant was sitting middleways of the store and the deceased was at the door of the store. He had been previously arrested for disturbing the peace and had been released, and had made threats against the defendant Phipps, and said he was going to the store to kill him. When he got to the door of the store he was requested to go away. He refused. The facts do not disclose that any demonstration was made by the deceased. The court in that case charged on an actual attack, when the issue in the case was a threatened attack, and this court reversed the judgment because of the failure of the court below to charge on a threatened attack.

In the case of Stewart v. State, 40 Texas Crim. Rep., 649, the judgment was reversed because the court failed to charge upon a threatened attack. In that case the testimony showed that the deceased and defendant, a short time previous to the homicide, had had a personal difficulty in the rear end of a saloon. The deceased had left the premises with intent to arm himself and return. Directly after deceased left defendant also disappeared. In a short time deceased returned, entered the saloon, and was rather boisterous, inquiring for the defendant, and cursing the Stuarts. He was ordered by the proprietor to leave, and as he stepped out of the door was fired upon and killed by the defendant. When he entered the saloon his right hand was under his coat and about his hip pocket, and his hand was still in this position when the pistol fired. The court submitted the case to the jury on the theory that the deceased had made an attack on defendant. This court held that the court should have charged upon a threatened attack, or an attack about to be made. In the case of Brady v. State, 65 S. W. Rep., 521, the court charged upon an actual attack, that is, in the charge limited the right of self-defense to an attack which had been made upon defendant by deceased. The testimony in that case showed the deceased was sitting on a wagon, on the opposite side from where defendant was standing; that angry words ensued. Deceased got off the

wagon on the north side, and started from near the front wheels on the north side of the wagon around the rear of the wagon, as if to engage in a difficulty with defendant, and he was armed at the time with an open knife. When he reached the rear of the wagon appellant fired the fatal shot. Deceased was some distance from him. That case was reversed because the court below did not charge on an attack about to be made. It will be noted that all of these cases are cited by appellant in support of his contention that no attack had been made, but the appellant relied upon the ground that the acts and the conduct of the deceased were such as to raise in the mind of the defendant the belief that he was about to attack the defendant when fired upon and killed. But to say that when a party says to another, "I will cut your God-damn heart out," he is in three feet of him, and lunges forward and seizes a butcher-knife, that this is not an attack, but a mere preparation, would be a perversion of language as understood in legal phraseology. Does a man actually have to strike before he would be considered beginning the attack? As Judge Hurt says, in the Boddy cases, supra, "Must the pistol be cocked and pointed at his antagonist before it can be said that the attack is begun?" We are, therefore, of opinion that the court was not called upon to charge upon an attack about to be made, but an attack then being made. See also Simmons v. State, 55 Texas Crim. Rep., 441; Casey v. State, 54 Texas Crim. Rep., 584.

Complaint is also made that the court's charge on threats was erroneous in that the court directed the jury, after charging upon the subject of threats, that: "If it then reasonably appeared to the defendant, and the defendant then reasonably believed that the deceased was then about to carry out or put into execution such threat, if any, and then he reasonably believed that he was in danger of losing his life or of suffering serious bodily injury at the hands of the deceased, and that acting under such reasonable apprehension of danger the defendant shot and killed deceased then you would, in such event, acquit the defendant. This charge is criticised in motion for new trial, and complained of on the ground that the court should have directed the jury that if it reasonably appeared to the defendant, viewed from his standpoint at the time of the killing; and that the charge was erroneous in stating that the defendant must reasonably believe that he was in danger of losing his life and that the omission to charge the jury that the killing must be viewed from defendant's standpoint at the time, and in telling the jury that the defendant must have reasonably believed that deceased was about to carry the threat into execution, was more onerous upon the defendant than the law allowed. We do not think that the charge was erroneous in stating that if defendant believed he was in danger of losing his life, nor that it placed upon defendant a greater burden than contemplated by law. The acts and conduct of the party at the time of the killing, in order to justify the defendant on the ground of

threats, must be such as to raise in his mind the belief that the deceased was about to carry the threats into execution. It may be that the court below was unhappy in the expression "reasonably," yet we do not think this would be ground for reversal. Before the defendant is justified in acting he must believe that deceased was about to carry the threat into execution, and simply because the court uses the word "reasonably" would not, we think, render the charge erroneous. It would be the better practice to omit the word "reasonably" and say if the jury believed. As to the complaint that the court omitted to tell the jury that the acts and conduct of the deceased at the time must be such as raised in the mind of the defendant at the time, viewed from his standpoint, we do not think that this omission in this particular paragraph can be regarded as injurious to the rights of the defendant. The court in his charge had already told the jury that in determining the rights of the defendant to act, that the matter must be viewed from the defendant's standpoint at the time of the killing. The court is not required to repeat over and over again in every paragraph of his charge the viewpoint of the defendant at the time of the killing. If he has once affirmatively charged the jury that the matter had to be viewed from the defendant's standpoint at the time of the killing, we think this is ordinarily sufficient, and that it is not necessary to repeat this in every paragraph of the charge.

On the trial of the case, after defendant had testified and left the stand, the State recalled him and asked him if he was not drinking on the night of the killing. He stated that he was not; that he had taken but one drink, and that was between dinner and supper of that day. The State then called the sheriff, Weir, who testified that in about thirty minutes after the killing he saw the defendant, and the defendant's breath smelled strong of whisky. The defendant objected to this testimony on the ground that it was an immaterial matter, and that the State had no right to impeach the defendant as a witness on an immaterial matter. If the purpose of this testimony had been to impeach the defendant, appellant's contention would be correct. We think the State was entitled to this testimony, for it would be a circumstance that could be considered in the trial of the case if the defendant at the time of the killing was drinking, and perhaps his memory and recollection of the facts immediately surrounding the killing would be somewhat clouded and that he would be unable to accurately recall the circumstances surrounding the killing, and for this purpose the State was entitled to the testimony. The defendant, however, contends that as the court limited the testimony to the credibility of the witness, it placed the defendant in an unfair light before the jury, for if they should consider that the defendant lied about whether he was drinking or not, then maybe he lied with regard to the facts of the case, but in limiting the testimony to the credibility of the witness, the credibility not only

reaches the truthfulness of the party's testimony, but also his memory in regard to things. If he was drinking at the time of the killing, the State would be entitled to show that when he places himself upon the stand to testify as to the circumstances surrounding the killing, and if his memory was failing or if he was so drunk as not to be able to give an accurate statement of the facts, then the State would have the right to show this, and this would affect his credibility as a witness. The court perhaps should not have placed this limitation upon the testimony, but in view of the record in this case we are inclined to the opinion that it could not be considered hurtful, or of sufficient importance as to require a reversal of the judgment.

This disposes of all the questions raised in the record, and finding no error in the record, the judgment is in all things affirmed.

*Affirmed.*

[Rehearing denied December 9, 1910.—Reporter.]