CLAYTON PINSON v. THE STATE.

No. 3165.    Decided June 25, 1906.

**1.—Murder in Second Degree—Argument of Counsel.**

See opinion as to argument of State's counsel for which he was reprimanded by the court, and the jury instructed not to consider same.

**2.—Same—Charge of Court—Self-Defense.**

Where upon trial for murder, the evidence showed that the case was one of real and not apparent danger to defendant, the court might have limited his charge on self-defense to real danger, but in submitting a charge on self-defense on appearance of danger, the same was beneficial to defendant and he could not complain. See opinion for charge on self-defense held sufficient.

**3.—Same—Charge of Court—Manslaughter.**

Where upon trial for murder the evidence showed according to the State's witnesses that deceased borrowed a shotgun and met defendant; that they could not hear what was said between the parties, but could see them, and which controverted the testimony of defendant that deceased had raised the gun or made any demonstrations with it so far as they could see; there was doubt as to whether the issue of manslaughter was in the case. However, the court charged the jury to find defendant guilty of manslaughter if from all the facts and circumstances they should find that defendant's mind was rendered incapable of cool reflections, and there was no error.

**4.—Same—Case Stated—Verdict Sustained.**

Where upon trial for murder, there was evidence that defendant shot and killed the deceased, and that there was no demonstration on his part to use a shotgun, but there was a heated and angry conversation between them, defendant claiming self-defense, and the court charged on murder in the second degree, manslaughter and self-defense, a verdict for murder in the second degree was sustained.

Appeal from the District Court of Anderson. Tried below before the Hon. B. H. Gardner.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Campbell & McMeans* and *A. M. Barton,* for appellant.—On question of self-defense and manslaughter: Swain v. State, 86 S. W. Rep., 335.

*J. E. Yantis,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was allotted a term of five years in the penitentiary for murder in the second degree.

There is a bill of exceptions in the record in regard to some remarks of the county attorney made in his argument to the jury. Upon objection being raised he immediately withdrew the remarks, and asked the jury not to consider them, and the court reprimanded the attorney, stating that they were improper even if he withdrew them, and that such conduct was wrong, and told the jury not to consider anything said by the county attorney as to other cases and other verdicts, but to try this case on its own facts.

The main attack is on the charge of the court on self-defense and manslaughter, in that the charge on manslaughter is too general, and that on self-defense is not sufficient, because it deals in generalities, etc. We do not agree with these contentions. Sufficient of the evidence to bring in review these matters may be thus stated. Deceased (Minzes) had complained to Stacy (uncle of appellant) about some hogs getting in his (Minzes') crop, deceased being a renter of Stacy. Appellant was ordered by his uncle, Stacy, to build a pen and put the hogs in it. He had succeeded in doing so, with the exception of one, and just preceding the difficulty had been down to the field and caught that hog. In going into the field controlled by Minzes he had to break the lock on one of the gates, and some inference is to be drawn from the testimony, that this enraged or angered Minzes. Shortly before the meeting between appellant and deceased, deceased had borrowed a gun at the nearby residence of Grigsby, and had started down the road, when he met appellant, both being on horseback. Immediately present was a negro in a wagon, whom appellant had with him down at the field. They were on their return from the field, when the meeting occurred with Minzes. The facts in regard to this meeting, from the defendant's standpoint are pretty much the same as detailed by the negro and appellant in their testimony; and for the purpose of illustrating the condition and environments, we will take the testimony of appellant himself. He says, in going to the farm and returning he had to go by Grisby's house, and through a lane at that point. Minzes was farming on the halves on the Stacy place. Stacy had some hogs about a mile below the house at the lower end of the plantation. While appellant was down there that morning, Minzes came, and requested him to tell his uncle to put up his hogs. Appellant told his uncle, who ordered him to haul rails out of the field, build a pen at the house and put up the hogs. He informed his uncle that Minzes had the gate locked. His uncle told him to take an axe, and if they refused to unlock the gate, cut the chain. Appellant went by and "told the women-folks," and they refused to open the gate; and he told them that he had orders to cut the chain. He did cut the chain, but to avoid a difficulty or trouble with the Minzes he went to the lower gate, a half mile from the Minzes residence. He hauled the rails, built the pen, caught all the hogs except one. On the evening of the difficulty he went down there again, about 4 o'clock, and not having any dog, he drove the hog out into the open and ran him down

on horseback. Returning he met Minźes. They stopped and engaged in conversation. He said to appellant, " 'Clayton, haven't I always treated you as a gentleman.' I said, 'Yes, you have always treated me as a gentleman.' I said, 'Haven't I always treated you as one.' He said, 'Until today.' He said, 'Don't you come on my place any more.' I said, 'Mr. Minzes, I am working here by the month, hired to my uncle here for wages, and .we have a crop in that field, and if he says for me to go down there I will have to go.' He said, 'Don't you come down there; if you do, I will kill you.' I said, 'I will have to go I guess, if he gives me orders to go.' He ripped out an oath, and said, 'You damn son of a bitch, I will kill you anyhow.' And he raised his gun to about that position (indicating) holding it in about a shooting position. I saw he was going to shoot, and I had my gun lying across my lap, and whirled it around and shot. I did not get it up. I do not think I had time to get it up to my shoulder. I shot Minzes in self-defense to save my own life." Without going further into the defensive theory of it, this is stating it as strongly as the testimony will admit: fully as strong as the negro's testimony.

Several members of the Grigsby family witnessed the meeting and the incidental matters connected with the killing, as it was within eighty yards of their residence, where Minzes had just previously borrowed the gun.

The charge on self-defense is criticised because it is not sufficiently full in regard to reasonable appearances viewed from the defendant's standpoint, and is rather restrictive. We do not believe there is any merit in this. The court charged the jury that every person is permitted by law to defend himself against any unlawful attack reasonably threatening injury to his person, and is justified in using all necessary and reasonable force to defend himself. He then further charges: "If you believe defendant shot and killed said Minzes, but that said Minzes was at the time trying to shoot him (defendant) and that defendant shot and killed Minzes, believing at the time he did so, as viewed from the defendant's standpoint that he was in danger of losing his life or of serious bodily injury at the hands of said Minzes, they should acquit." He further charged the jury: "A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to protect his life or person and it is not necessary that there should be actual danger, as it appeared to him from his standpoint at the time, and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant." And further: "If from the evidence you believe defendant killed the said Minzes, but further believe at the time of so doing the deceased had made an attack on him with a gun, or had made a demonstration with a gun as if to shoot defendant, which, from the manner and character of it, and the relative strength of the parties, and the words, if any,

of deceased accompanying the assault or demonstration, if any, and the defendant's knowledge of the character and disposition of deceased, caused him to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectations or fear, the defendant killed the deceased, then you should acquit him, and if the deceased was armed at the time he was killed and was making such an attack, if any, on defendant, and if the weapon used by him and the manner of its use were such as were reasonably calculated to produce death or serious bodily harm, then the law presumes the deceased intended to murder or aimed to inflict serious bodily injury upon the defendant." We believe these charges sufficiently and fairly presented self-defense. If defendant's theory is correct, as made by his testimony, and that of the negro witness sustains him, then apparent danger was not in the case. It was a case of real danger. The court might have limited the charge on self-defense to real danger. But the court went further and gave appellant the benefit even of the appearances of danger.

The court out of an abundance of caution gave a charge on manslaughter, which is not raised by the defendant's evidence. If his testimony is to be credited he had a clear case of self-defense, and the jury could have acquitted him. However, witnesses for the State put a somewhat different light upon the transaction. Deceased borrowed the shotgun from them, and started down the lane, and seventy-seven measured yards from the Grigsby residence met appellant and the negro. They did not hear what was said between the parties, but could see them. Their testimony excludes the idea that Minzes had raised the gun or made any demonstration with it so far as they could see. There was some conversation between them, which these witnesses did not hear. But those of the Grigsby family, who were watching the parties at the time exclude the idea of a demonstration by deceased with a gun. While it was safer to give the charge on manslaughter in this connection, there may be a question whether the issue was in the case. But of this appellant cannot complain. The charge authorized the jury to find appellant guilty of manslaughter if from all the facts and circumstances introduced in evidence, they should find that appellant's mind was rendered incapable of cool reflection. The jury gave him murder in the second degree.

It is contended that the evidence is not sufficient. The testimony for the State justified the jury in finding the appellant guilty. If appellant shot Minzes to death, and there was no demonstration on Minzes part to use a shotgun, but there was a heated and angry conversation between them, and he determined to kill for this reason, then appellant was at least guilty of murder in the second degree, unless there were facts growing out of the matter which would render his mind incapable of cool reflection; and this the jury did not find; or unless the jury should believe defendant's theory of it, and it was self-defense, and this they did not do. There was evidence in our

judgment sufficient to justify the jury in finding him guilty of murder in the second degree.

Finding no reversible error in the record, the judgment is affirmed.

*Affirmed.*

Brooks, Judge, absent.