## J. M. SIMMONS v. THE STATE.

### No. 4397. Decided March 3, 1909.

**1.—Murder—Evidence—Cross-Examination—Remarks by Judge.**

Where upon trial for murder the defendant on cross-examination showed that the State's witness had been charged with robbery, whereupon, on objection of defendant, the court refused to let State's counsel ask his witness what had become of the charge against him, and in making this ruling stated that if an objection to defendant's cross-examination of the witness had been made in the beginning that the court might have sustained it on the ground that the testimony was immaterial and irrelevant. Held, these remarks were reversible error. Following Moore v. State, 33 Texas Crim. Rep., 306, and other cases.

**2.—Same—Evidence—Expert Testimony.**

Where upon trial for murder the defendant introduced an expert witness and showed that deceased was shot in the neck, severing both the jugular vein and the artery connected therewith, and the State claimed that the body of the deceased had been moved from where it fell and left no traces of blood on the ground, it was reversible error to exclude the expert opinion of the witness that a wound inflicted in this manner would have been such, that such a quantity of blood would have flowed from the wound immediately as would have left the signs of the blood where the body fell and along the ground if the body of the deceased was dragged away.

**3.—Same—Charge of Court—Self-Defense—Apprehension of Danger.**

Where upon trial for murder the evidence showed that when th defendant fired, the deceased had his gun practically in a firing position, cocked, presented, with his hand on the trigger, and that defendant shot in the belief that his life was in imminent danger, there was no error in the court's charge in predicating the defendant's self-defense upon an actual attack by the deceased upon the defendant, but the charge should have been so framed that the question of danger must be viewed from defendant's standpoint.

**4.—Same—Argument of Counsel—Remarks by Judge.**

See opinion suggesting impropriety of comments by the court, and greater moderation in argument of State's counsel.

Appeal from the District Court of Roberts.    Tried below before the Hon. H. G. Hendricks.

Appeal from a conviction of murder in the second degree; penalty, six years imprisonment in the penitentiary.

The opinion states the case.

*Hoover & Taylor, W. T. Allen* and *W. R. Ewing,* for appellant.— On question of expert testimony:  Cases cited in opinion.  On question of court's remarks:  Kelly v. State, 33 Texas Crim. Rep., 31; McCullar v. State, 36 Texas Crim. Rep., 213; Benson v. State, 39 Texas Crim. Rep., 56, 44 S. W. Rep., 163, and cases cited in opinion. On question of charge of court:  Cases cited in opinion.

*F. J. McCord,* Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—Appellant was indicted in the District Court of Hansford County on the 14th day of October, 1907, charged with the murder of one George Aitken, alleged to have been committed in said county on the 30th day of June of the same year.  The case was thereafter transferred on change of venue, by agreement, to Roberts County, and on the trial ending on the 15th day of February, 1908, appellant was found guilty of murder in the second degree, and his punishment assessed at confinement in the penitentiary for six years.

We deem it unnecessary to give an extended statement of the facts. Briefly, the evidence shows that both appellant and deceased resided on Palo Duro Creek, in Hansford County, their residence being something like a. mile and a half apart.  Appellant lived below deceased on the creek, but his land extended and his fence was built something like three hundred yards from Aitken's residence.  Appellant was mainly engaged in raising alfalfa, and had not made any serious effort to grow any other crops.  From the testimony it seems that the hogs of Aitken and probably others had been making serious depredations upon appellant's crops, greatly to his annoyance and to the extent of causing him considerable loss.  He had made some effort to stop these inroads, and out of this and probably other facts developed the strained relations between the parties.  The evidence tended to show threats on the part of deceased to kill appellant, or at least do him some serious injury, and it is shown beyond doubt or question that deceased was a dangerous, violent and quarrelsome man, and also that he had been engaged in a number of difficulties and controversies with his neighbors, which facts came to the knowledge of appellant.  On the morning of the killing, which was on Sunday morning, appellant and his young son, Lindsey Simmons, left the former's residence to go some distance from the house down in the alfalfa field with the avowed purpose as stated by them of looking to see if there were any hogs in the field, and also to finish stacking

some alfalfa, which had been cut, in view of threatened impending rain, and with the purpose on appellant's part, as stated by him, if he killed deceased's hogs, to pay for them. The testimony of appellant and his son shows that when they got to the field they discovered only one hog, and in view of this fact and the messages which appellant had sent deceased, he seemed to think it likely that deceased had made some effort to get his hogs out of the field, and stated, therefore, that he would not kill the hog but would set his dogs on it and run it out of the field. The dogs were set upon the hog and run it into a branch or creek, and soon after this, or about this time, deceased was seen coming from towards his residence with his gun in his hand in a very rapid gait. At this time appellant and his son were on different sides of the creek, appellant having a rifle and his son a shot gun. Appellant seems to have crossed the creek to where his son was and exchanged guns with him. When deceased came up some colloquy ensued. In the meantime appellant claims he had called out to deceased to go back, that he wanted no trouble with him. He testifies further that deceased proposed that they step off twenty paces and shoot it out, to which he replied, that it did not matter or something to that effect. That he really believed this was a pretext to get some advantage of him, and that at this time deceased was somewhat in the act of walking away from him, and yet with his back not squarely to him, and that after he had gone a few paces, he turned partly and almost entirely around, with his gun almost raised to a shooting position, cocked, with his left hand supporting the gun, and his right hand on the trigger, and while almost in the act of shooting, appellant fired upon him and killed him. There were two witnesses for the State, Alfred Kinnebrugh and Thomas Aitkens, who gave a different account of the matter, and who in substance testified that while quite a distance away they were in a situation to see and did see the parties, and at the time of the shots, and did not see deceased making any demonstration. These witnesses also testify, and especially Kinnebrugh, that immediately after the shot was fired, appellant and his son went to the place where deceased was standing and appeared to be dragging something along through the alfalfa, and then stooped down over the body as if in the act of fixing something. There was some proof also to the effect, in substance, that the cartridge which was found in deceased's gun had blood on the end of it, and that there was also some blood about the gun. The State's theory evidently was and they sought by this testimony to prove that the bloody cartridge in the gun had been placed there by appellant, and that deceased was dragged from the place where he had been killed and the body placed in such position and the gun in such position as to support and lend color to his theory and claim of self-defense. This is not intended by any means to be a full statement of the case, but it is perhaps sufficient to illustrate the questions discussed. Both

the witnesses Kinnebrugh and Aitken were some 250 yards from the place of the killing, and there was quite a controversy as to just where they were and what, if anything, they saw.

1. During the progress of the trial the State introduced as a witness one George Trost. By him they sought to prove and did prove that he was near to the scene of the difficulty and heard, just preceding the firing, some loud talking in a voice which he did not believe to be the voice of deceased, but he thought he heard some one calling him and immediately went to the scene of the fatal difficulty. Just before he got there he met Kinnebrugh coming away and saw George Aitkens at or near the place where the body of deceased lay. There were many discrepancies in the testimony of both Kinnebrugh and Aitkens, and the cross-examination of these witnesses and the disclosures thereby brought about were such as must and probably would have impaired the weight of their testimony with the jury. The testimony of this witness Trost was important to the State and very damaging to the appellant in that it supported their contention and claim that they were in such a point of nearness to the difficulty as to have seen what transpired at the immediate time of the shooting. On cross-examination the defendant proved by the witness Trost that he had been charged in Oklahoma with robbing a Jew peddler and also with getting too much whisky. Soon after these developments on the inquiry of the defendant, the State, on redirect examination, asked him what had become of the charges against him. This question was objected to by counsel for appellant and the objection sustained. In sustaining this objection for the appellant the court made this remark, as stated in the bill of exceptions: "If there had been any objection made at the start I might have sustained it on the ground that it was immaterial and irrelevant." Counsel for defendant excepted to this remark of the court made in the presence and hearing of the jury because said remark was on the weight of the evidence, was in the presence and hearing of the jury, and was calculated to prejudice the rights of the defendant, and because said testimony was admissible and relevant in this case. We think the court was in error in making such remark in the presence and hearing of the jury; nor can we say that the error was not harmful. That the testimony of this witness was important is not to be doubted. That it was proper for the de-fendant to contradict or impeach the witness by any method known to the law, of course, admits of no question. For the court to say, in the presence and hearing of the jury that if the objection had been timely made he might or would have sustained the objection to it as being irrelevant and immaterial, must obviously have had the effect to impress the jury that the attack on the credibility of the witness sought to be made by the defendant was inconsequential and that the proof offered to support same was both immaterial and irrelevant. In the case of Moore v. State, 33 Texas Crim. Rep., 306,

we said: "The court should simply rule upon objections to the admission or rejection of testimony without comment. Such is the spirit, and even letter, of the statute. Inquiry on appeal as to whether injury was caused by comments of the court in such state of case ought not to be a question for revision." Again, in the later case of Kirk v. State, 35 Texas Crim. Rep., 224, Judge Hurt, speaking for the court, and discussing a quite similar question, says: "To corroborate the prosecutor, who swears positively that appellant was the party who assaulted and robbed him, the State introduced evidence of horse tracks found near the place of robbery, and circumstances which tended strongly to show that they were made by the appellant's horse. That appellant objected to this evidence, on the ground that it was immaterial. In ruling upon the admissibility of this testimony, the learned judge below remarked, in the hearing of the jury, that he thought that evidence of that character was highly material. To these remarks, appellant, by counsel, objected, reserving his bill of exceptions. Article 677, Code Criminal Procedure, provides that in charging the jury the court shall not express any opinion as to the weight of the evidence. Article 729 provides that, in ruling upon the admissibility of evidence the judge shall not discuss or comment upon the weight of same, or its bearing in the case, but shall simply decide whether or not it be admissible; nor shall he at any stage of the proceedings previous to the return of the verdict make any remark calculated to convey to the jury his opinion of the case. Now, let us suppose that in the charge of the court he had instructed the jury with reference to the horse tracks, that he believed this was highly important and material testimony, would he not have been charging the jury in regard to the weight of the testimony? Most evidently he would. It is the object of our code, gathered from every provision relating to that subject, to prohibit the judge from expressing any opinion as to the weight of the testimony or credibility of the witnesses. The court can neither do this in his charge nor in ruling upon the admissibility of testimony. See Wilson v. State, 17 Texas Crim. App., 525; Crook v. State, 27 Texas Crim. App., 198; Reason v. State, 30 S. W. Rep., 780; Lawson v. State, 32 S. W. Rep., 895." We can well understand how in practice it may sometimes become important, with a view of making clear to counsel the precise limit and scope of a ruling in respect to a matter of evidence, that the court should make some statement, and it may sometimes happen in seeking information from counsel the court may have occasion to use language that might be construed into some expression touching the importance or scope of the testimony offered or the nature of the objections made, but ordinarily the rule laid down in the case first quoted ought to be strictly and literally observed; that is, the court ought, without discussion or comment, to rule and either admit or reject proffered testimony. The fact that a statement of the court as to the importance or unimportance of

testimony is stated from the bench would often make it no less hurtful than if contained in the written charge. The trial judge is to the jury the Lord's anointed; his language and his conduct have, to them, a special and peculiar weight. Literally, in such matters, his communications should be, yea, yea and nay, nay.

2. During the progress of the trial, and while appellant was introducing his testimony, he produced as a witness Dr. M. L. Gunn. This witness qualified as an expert and testified in substance, that deceased was shot in the neck, severing both the jugular vein and the arteries connected therewith. Having before this shown by several witnesses that a careful examination of the ground and alfalfa growing thereon at and near the place where the body of deceased was found without discovering any sign or trace of blood and evidently with a view of adducing before the jury all possible testimony from which they could gather the conclusion of the impossibility of the body of deceased having been moved as indicated by the testimony of the State's witnesses, without there being some trace of blood on the ground or alfalfa, the appellant proposed to prove by this witness, and if permitted would have answered that a wound inflicted in the manner in which deceased was, would have been such as that such a quantity of blood would have flowed from the wound immediately as would have left a sign where the body fell. This was in response to a question as to whether if a person was shot in such a way as to sever the jugular vein and the arteries in connection therewith whether or not the blood would begin to spurt from the wound immediately and whether or not the blood would flow in such quantities as to leave a sign of the blood upon the ground where the body fell. The objection to this testimony was that same was not the subject of expert testimony. The court makes, in approving this bill of exception, the following statement: "The following is the question as taken from the stenographer's notes asked by defendant's counsel as to said matter: 'State to this jury whether or not if the body fell, shot as I have described, and then be dragged ten or fifteen steps, whether or not it would be possible to drag a body that way without leaving traces of blood where the body was dragged?" Counsel for the State: We object to that as not a proper subject of expert testimony. The court: Sustain the objection. Mr. Taylor: We except."

An inspection of the statement of facts shows that the witness, among other things, testified as follows: "There is a large vein on the inside of the muscle on both sides, and there is an artery on the inside of the vein. All the blood to the head goes through those veins. If those veins are severed and those arteries are severed, the result would be that the man would bleed to death pretty quick. If a man was shot so the jugular vein and the artery were cut, the blood would begin to flow immediately. If the artery was cut in two it would come in spurts with every pulsation of the heart; if the

vein was cut it would flow in small streams. If a man was shot in the center of the neck that would sever the artery."

In this condition of the record and proof it is our belief that appellant was entitled to have the opinion of this witness as an expert, in view of all the facts stated by him as to whether the flow of blood would have been so immediate and in such quantities as to have left on the ground and vegetation signs of blood easily discoverable. It seems to us that it might be a matter of common knowledge that if the jugular vein was severed, that it would result in loss of blood, but as to how great the loss, how immediate, whether in such quantities as would have become evident and as would have left impressions and signs on the ground were matters peculiarly within the knowledge of an expert and was such a question as he should have been permitted to express an opinion upon. In the case of Pilot v. State, 38 Texas Crim. Rep., 515, a somewhat similar matter came before this court. In that case Dr. Reeves was permitted to state that he had examined the leg of the deceased who had been injured by a gunshot wound. That the bone had been fractured in three places and the muscles and arteries had been severed. That his leg at the time was covered by heavy drawers and pants and the sock was drawn up over the drawers. The testimony in the case showed that he had been shot in the house about 12 o'clock, and that his dead body was found the next morning about eighteen feet in the rear of the store in a gully. In this condition of affairs the expert was permitted to testify on these facts that it was possible for the deceased to have been shot in the house as related and to have gotten to the gully eighteen feet in the rear of the store and left no sign of blood along the route. It was held in this case that such testimony came within the rule of expert testimony. Clearly, if a physician who qualifies as an expert is permitted under a given state of facts shown in the evidence to express the opinion that a wounded person might go a given distance without leaving any sign of blood along the route, it would seem necessarily to follow that the converse of this proposition would be true, and that he might testify and should be allowed to testify, if such in his opinion was the case, that a different wound would be such as inevitably to leave signs of blood along the route either voluntarily undertaken by him or along one which he had been dragged. Such also, as we understand, is the rule of the Supreme Court of the United States in the well considered case of Bram v. United States, 168 U. S. Rep., 532. (Supreme Court Rep., vol. 18, page 183.) In that case Mr. Justice White, speaking for the court, uses this language: "In objection to a question asked of a medical witness, whether in his opinion, a man standing at the hip of a recumbent person, and striking blows on that person's head and forehead with an ax, would necessarily be spattered with or covered with some of the blood, was also properly overruled. We think the assumed facts

recited in the question were warranted by the proof in the case, and that the evidence sought to be elicited from the witness was of a character justifying an expression of opinion by the witness, the jury, after all, being at liberty to give to the evidence such weight as in their judgment it was entitled to. Hopt v. Utah, 120 U. S., 430, 7 Sup. Ct., 614." See also Wharton Crim. Evidence, sec. 412; Robinson v. State, 63 S. W. Rep., 870; Henry v. State, 49 S. W., 97; Sebastian v. State, 53 S. W. Rep., 875.

3. The charge of the court on the issue of self-defense is most vigorously and fiercely assailed by counsel for appellant. It is urgently insisted that same is erroneous in that it submits to the jury as a ground of self-defense, the issue of actual attack and danger only and the same does not submit the issue of reasonable apprehension of danger. We have carefully examined the statement of facts and are not prepared to agree with counsel for appellant that the charge of the court in this respect is erroneous or subject to just criticism. Without undertaking to set out at length the testimony, which would require more time than can be given to it, the evidence of both appellant and his son was to the effect that at the moment appellant fired, the deceased had his gun practically in a firing position, cocked, presented, with his hand on the trigger, and that he shot in the belief that his life was in imminent, pressing and immediate danger. Of course, charges on self-defense, as upon all other issues, must and should conform to facts. It may sometime happen that the testimony would present both the issue of actual attack, as well as a ground of self-defense based on reasonable apprehension of danger. The evidence may sometime present the latter defense without the testimony showing an actual attack made. But as we read the record in this case the acts and conduct of the deceased had gone far beyond the act of mere preparation, but that his every movement, whole conduct and the entire acts constituted an actual attack made by him on appellant. We do not understand that, in order that there should be an attack that it must be a completed attack; but it means such progress in the hostile demonstration and movement as to go beyond the mere acts of preparation and such as to demonstrate beyond doubt the beginning and evidence the progress of an actual hostile movement.

In this respect this case is easily distinguished from all the cases cited by appellant: Phipps v. State, 34 Texas Crim. Rep., 560; Poole v. State, 45 Texas Crim. Rep., 365, and Brady v. State, 65 S. W. Rep., 521. This case in its facts is strikingly like those considered in Pinson v. State, 50 Texas Crim. Rep., 234. See also Casey v. State, 54 Texas Crim. Rep., 584, 113 S. W. Rep., 534.

On this subject the court did instruct the jury as follows: "You are charged that homicide is permitted in the necessary defense of person, that is to say, that when the attack is such as to produce in the mind of the person doing the killing at the time of the homi-

cide a reasonable expectation or fear of death, or serious bodily injury, and considering the plea of self-defense of the defendant in this case, it is your duty to look at the transaction from what you believe from the evidence was the standpoint of the defendant at the time of the homicide.

"Hence: You are instructed in this case that if you find and believe from the evidence that at the time the defendant Simmons fired the fatal shot, the deceased Aitkens was in the act of making an attack upon him, Simmons, with a rifle under circumstances which reasonably indicated to the said Simmons that the said Aitkens intended to murder him, or inflict upon said Simmons some serious bodily injury, and that said rifle and the manner of its use were such as were reasonably calculated to produce such results, or either of them, you are charged that the law presumes that the deceased intended to murder, or inflict serious bodily injury upon the defendant, and it will be your duty to find the defendant not guilty, and in this connection you are further charged that the defendant was not required to retreat at the time to avoid the necessity of killing deceased."

This, under the facts of the case, was, as we believe, a sufficient submission of the issue of self-defense. The only portion of same which is subject to any criticism is a part of the first sentence of the clause above quoted, which is as follows: "It is your duty to look at the transaction from what you believe from the evidence was the standpoint of the defendant." This is criticised and thought to be objectionable, in that the jury may have inferred that they would judge of the transaction from what the after developments disclosed to be the real facts and would not determine the question of danger under the circumstances as they appeared to appellant at the time and in his great extremity. We think this criticism is probably well taken, and on another trial we suggest that this portion of the charge of the court be so framed as not to be subject to this objection.

4. There are a number of other questions raised in the record, most of which relate to remarks of the court during the progress of the trial, to demonstrations of counsel in the presence of the jury, and to what are urged as improper arguments and statements by counsel for the prosecution in the course of their arguments to the jury. These are matters which are not likely to occur again. While some of the matters urged are subject to fair criticism, they are scarcely of such a substantial or weighty nature as would justify us in reversing the case; but we beg again to suggest to the courts the impropriety of comments upon the proceedings in the development of a case, and the admission of testimony, and to urge upon counsel for the State greater moderation and restraint in the matters of appeals to the jury and the introduction of outside and extraneous matters having no foundation in the testimony, and which are not proper and legitimate subjects of discussion.

Vol. 55 Crim.—29.

On the grounds stated the judgment of the court below is set aside, and the cause remanded for trial in accordance with law.

*Reversed and remanded.*