## BILL MILO AND ANTHONY BRADFORD V. THE STATE.

### No. 475.    Decided March 23, 1910.

#### Rehearing denied May 4, 1910.

**1.—Murder—Continuance—Bill of Exceptions—Motion for New Trial.**

Where, upon appeal from a conviction of murder, it appeared from the record that appellant had failed to reserve a bill of exceptions to the court's action overruling the motion for continuance, the matter could not be considered; and the same can not be reviewed because of the court's action in overruling a motion for new trial.

**2.—Same—Motion for New Trial—Bill of Exceptions—Practice on Appeal.**

A general bill of exceptions, to the overruling of a motion for new trial, does not operate as a bill of exceptions to the rulings of the court set out in the motion for new trial.

**3.—Same—Evidence—Conspiracy—Co-Conspirators.**

Where, upon trial for murder, the State's theory was that the same was committed in an attempt of robbery, there was no error in admitting testimony that, a day or two before the homicide, the person intended to be robbed received some money, which he had in his hands while passing two of the conspirators, who afterwards acted with the defendant in procuring firearms and carrying out the attempted robbery, which resulted in the killing of deceased.

**4.—Same—Remarks by Judge—No Comment on Testimony.**

Where, upon trial of murder, the remarks by the judge complained of simply amounted to a statement to the effect that as defendants had ceased their cross-examination at a certain point of the testimony that he would permit the State to go further with it, there was no error. This was not a comment upon the testimony.

**5.—Same—Evidence—Exhibition of Clothing—Range of Shot.**

Upon trial of murder, where it appeared that one of the State's witnesses while going to the scene of the shooting, was shot, and the question of the direction from which he was shot became an issue, there was no error in permitting the witness to state the circumstances as to how he was shot and to exhibit his coat with the shot holes in it to the jury.

**6.—Same—Charge of Court—Robbery—Person Intended to be Robbed—Degree of Murder.**

Where, upon trial of murder, the evidence showed that the defendants were in the act of committing robbery, but instead of killing the person intended to be robbed, killed the deceased, who was trying to flee from the tent in which the person intended to be robbed was, there was nothing in the contention of the defendants that the killing of another man in the attempted perpetration of robbery could not be murder in the first degree; and the court was correct in his charge that the killing of another person than the one intended to be robbed under the circumstances would justify a conviction of murder in the first degree, and that murder in the second degree was eliminated.

Appeal from the District Court of Jones. Tried below before the Honorable Cullen C. Higgins.

Appeal from a conviction of murder in the first degree; penalty, of one defendant being death, and of the other life imprisonment in the penitentiary.

The opinion states the case.

*Davenport & Davenport,* for appellants.—On question of admitting

testimony as to money received by the person intended to be robbed the day before the homicide in passing coconspirators: Morton v. State, 43 Texas Crim. Rep., 533; 67 S. W. Rep., 115; Godwin v. State, 38 Texas Crim. Rep., 466; Strange v. State, 38 Texas Crim. Rep., 280; 42 S. W. Rep., 551; Holley v. State, 46 S. W. Rep., 39; Cox et al. v. State, 8 Texas Crim. App., 254; Martin v. State, 25 Texas Crim. App., 557; 8 S. W. Rep., 682.

On question of remarks of judge: Simmons v. State, 55 Texas Crim. Rep., 441; 117 S. W. Rep., 141; Moore v. State, 33 Texas Crim. Rep., 306; Kirk v. State, 35 Texas Crim. Rep., 224.

On question of admitting testimony as to direction of shot and exhibiting clothes of State's witness: Hennessy v. State, 23 Texas Crim. App., 340; Wilkerson v. State, 31 Texas Crim. Rep., 86; Chumley v. State, 20 Texas Crim. App., 547.

On question of the court's charge on conspiracy and principal: Ballew v. State, 34 S. W. Rep., 616.

On question of killing a third party in perpetration of robbery and court's charge on murder in the first degree: McCoy v. State, 25 Texas, 33; Ferrell v. State, 43 Texas, 503; Musick v. State, 21 Texas Crim. App., 69; 18 S. W. Rep., 95; Howard v. State, 58 S. W. Rep., 77.

*John A. Mobley,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant Bill Milo was awarded the death penalty, and Bradford lifetime imprisonment in the penitentiary under an indictment charging murder of Antonio Charves.

This is a companion case to Wiley Bass v. State, this day decided. Perhaps it might be sufficient, in a general way, to refer to the opinion in that case for a statement of the facts in this case. There is some difference in the cases by reason that questions were raised in the trial of this case not raised in the Bass case. Suffice it to say, in a general way, the facts substantially show two theories: First, a homicide in pursuance of a conspiracy entered into between appellants, Bass and Joe Sexton. Second, on the part of appellants, that they had played cards in the tent of H. H. Garcia with Garcia and other Mexicans about two or three o'clock on the Sunday evening prior to the homicide occurring about dark, in which Garcia unlawfully took their money and they were seeking to recover this money. That in the game, which was monte, they had placed money upon cards, one four dollars in silver, and the other six or eight dollars in silver of smaller denomination, and that Garcia had taken their money and appropriated it without winning it. That they were forced to and did leave, and went away. That later they met Bass and Sexton some distance from the camp of the Mexicans; that after talking a while together, that appellants, and Bass went to the home of a Mr. Greek, where they bought a shotgun and six-shooter, and also ammunition. About dark they went to the

neighborhood of the Mexican camp. Bass and Sexton went into the tent of Garcia, where they ate and paid for their supper; that Bass came out, leaving Sexton in the tent; that about that time these appellants went to the tent, and appeared at the opening of it, armed with a shotgun and six-shooter, and demanded the return of their money; that it was not returned, and the killing followed. It is deemed unnecessary to follow up the details of their statements in regard to this affair. The State's theory of the matter is practically and substantially this: That there was a conspiracy formed between appellants, Bass and Sexton to rob the Mexicans of their money. The State's testimony excludes the idea that there was a game of any sort played between the Mexicans and appellants on the Sunday evening. It is further shown by the State that Bass and Sexton went to the tent of Garcia, obtained their supper, and asked Mrs. Garcia if she could change a bill; she informed them that she could, went to a valise, opened it and took out some money from a handkerchief or sack which she opened up in their presence. This sack or handkerchief contained quite a lot of money. That thereupon Bass immediately handed her fifty cents to pay for the supper, leaving Sexton in the tent. He returned to and informed appellants of conditions at the tent. He, Bass, left the tent; about ten minutes or such matter subsequent to his departure, appellants appeared at the opening of the tent armed with a shotgun and pistol, and demanded the money of Garcia. This brought up the trouble. In the tent at the time was Sexton, sitting by the table where he had eaten his supper, Manuel Cantu, and deceased, Antonio Charves. Deceased arose from where he was sitting, and started out of the tent, when he was shot by appellant Milo with a shotgun, whereupon Sexton and Cantu went out under the tent. The State's evidence further is that Bass was standing by the east side of the tent at the time the trouble was going on in the tent and at the time of the homicide. Appellants' contention was that Bass had gone away from the tent, and was off fifty to seventy-five yards at the time of the homicide. It is further in evidence that appellants went from Stamford to the station known as Lueders, where they left the train and went thence to the Mexicans' tent and engaged in gambling. The State's contention was that they did not then go to the camp, but that they sought Bass and Sexton, and after conferring with them, bought the shotgun and pistol from Mr. Greek. This perhaps is a sufficient statement of the case to bring in review the questions relied upon for reversal.

1. It is contended that appellants were entitled to a continuance, and the court erred in refusing to grant same. This will not be considered inasmuch as a bill of exceptions was not reserved to this ruling of the court. This matter was assigned as error in motion for new trial, among quite a number of other errors assigned in that motion. A general bill of exception was reserved to the action of the court in overruling the motion for new trial, but this is not sufficient to bring in

review the action of the court overruling the application for continuance. A general bill of exceptions to the overruling of a motion for new trial does not operate as a bill of exceptions to the rulings of the court set out in motion for new trial.

2. Bill of exception No. 1 recites that while H. H. Garcia was upon the stand, he was asked by the prosecution the following question: "Where were you on the day before the Sunday that Charves was killed? A. Lueders. Anybody pay you any money that day?" Appellants objected at this point until the State should show or connect the defendants with the money transaction. These objections were overruled, and the witness answered, "Yes, sir."

Another bill of exception shows the State asked the same witness the following question: "Who paid you any money on Saturday, if anybody? A. Jesus Lopez. Q. Well, how much did Lopez pay you that afternoon? A. About $50 or $60. Q. Did you see them that afternoon, Wiley and Joe? A. Yes, sir." Various objections were urged to this testimony.

Another bill of exception recites that the same witness was permitted to testify as follows: "I was in Lueders on the day before the Sunday that Charves was killed, Jesus Lopez paid me some money that day, about $50 or $60. I saw Wiley and Joe there that day; I carried the money home with me." Various objections were urged to this testimony.

The same witness was further permitted to testify, over appellants' objection, to the following facts: "I was in Lueders on the day before the Sunday that Charves was killed, Jesus Lopez paid me some money that day, about $50 or $60, I saw Wiley and Joe there that day, I carried the money home with me." This testimony went before the jury with the following statement from the court: "That objection will be overruled in view of the fact that the defendants' counsel had cross-examined the witness as to how he came with the money that was in the valise and he accounted for some twenty odd dollars of it by payment of board and he had refused to cross-examine further." Objection was urged to that portion of the remarks of the court as follows: "refused to cross-examine further," because it was likely to prejudice the rights of the defendants, and the court then withdrew the remarks "refused to cross-examine further." The bill is a little confused, as written, as to whether the remarks were withdrawn or not. If withdrawn appellants could not have been injured by it, but if not, we are of opinion that there was no such error as would require a reversal of the judgment. The cases cited by appellants to support this proposition—Simmons v. State, 55 Texas Crim. Rep., 441; 117 S. W. Rep., 141; Moore v. State, 33 Texas Crim. Rep., 306, and Kirk v. State, 35 Texas Crim. Rep., 224—are not in point. The remarks of the court in those cases were a comment upon the weight of the testimony. This was not the case in the bill of exceptions found in this record. It simply

amounted to a statement of the court to the effect that as appellants had ceased their cross-examination at that point, he would permit the State to go farther with it. We are of opinion this was not violative of the statute which prohibits the court from commenting on the weight of the evidence, or giving his view of the testimony. The previous bills of exception, in regard to the fact that Lopez had paid Garcia money on the day before, are thus qualified: "It was subsequently shown by the testimony of H. H. Garcia that he, Garcia, had quite a roll of bills of money in his hand on that day and met Wiley Bass on the sidewalk while the money was held in his hand, and this was the money referred to in the question and answer." The bills are hardly sufficient to present the matter. They do not undertake to exemplify the record sufficiently to show how the introduction of this evidence could have been injurious, and perhaps we might rest the decision of these matters upon the bills as qualified by the court, but going to the statement of facts we find that quite a lot of Mexicans were working out two or three miles from Lueders, clearing away brush and timber from land, and that Garcia was what the Mexicans called their "Captain." He was in Lueders on Saturday before the homicide Sunday evening, and received this money from Lopez for the purpose of being apportioned among the hands who had been working at that point; that while going along the street he passed Bass and Sexton, having these bills in his two hands. That the next morning the two appellants in this record came down from Stamford to Lueders, got off the train, met and were with Bass and Sexton, and after being with them a while, Bass and these two appellants went to the house of Mr. Greek, from whom they purchased a shotgun and six-shooter, which were later in the evening used in the homicide. The record further shows, as before stated, that after purchasing the arms the parties went near the Mexican camp along about dusk or dark, that these two appellants stopped off some distance, two or three hundred yards perhaps, in mesquite timber or brush, while Bass and Sexton went to the tent of Garcia, ate their supper, asked Mrs. Garcia if she could change a bill in order that they might pay for their supper, and when she discovered to them the money which was in the valise, Bass immediately paid the fifty cents due for the supper of himself and Sexton and left the tent, Sexton remaining. That in about ten minutes or such matter afterward, appellants appeared upon the scene and the attempted robbery was followed by the homicide. Whether viewed from the bills or from the entire record, this testimony was admissible. The action of the parties indicated strongly from the circumstances a conspiracy on the part of appellants, Bass and Sexton. Whether the conspiracy had been formed at the time Garcia had the money in his hands and passed them on the street in Lueders or not, would not affect the question if the conspiracy was formed the next day for the purpose of robbing Garcia of the money.

The parties were together in a pasture before the attempted robbery, and successful homicide, Bass and Sexton being two of the number, and the subsequent action of Bass and Sexton and appellants was very strong evidence of the fact that they went to Garcia's camp for the purpose of robbing him, and it might be asserted as a fact that these appellants knew nothing of the money that Garcia had the evening before except through information received from Bass and Sexton. Under the circumstances this testimony was clearly admissible. For authorities see White's Annotated Penal Code, section 1241. The rule is too well settled to require discussion that where a conspiracy has been entered into by parties, all acts and declarations of coconspirators are admissible against each coconspirator until the final consummation of the end and object to be obtained by the conspiracy has been accomplished, and it is evident in this case that this conspiracy was formed for the purpose of robbing Garcia of the money he had, and two of the parties were placed in such position that they could have known, and doubtless did know the fact that Garcia had the amount of money he received the evening before, and appellants came down to Lueders the following morning, and got with the other two parties, Bass and Sexton, and remained with them to the time of the attempted robbery, and Bass at least assisted in and advised and encouraged them in securing the arms with which to carry out their object of conspiracy, and Sexton accompanied them to the scene of the homicide.

3. While the witness, Jesus Lopez, was on the stand, testifying for the State, a bill of exceptions was reserved to the following:

"Answering question, 'What did you do when you heard the shooting?' 'I went to see because it was the captain, I went to see what it was.' Answering question, 'Did you go to Garcia's tent?' 'No sir.' Answering question, 'What is the reason?' 'Because he heard nothing.' Answering other questions: 'I was eight, nine or ten yards from Garcia's tent when I heard the shooting. I did not see any people around Garcia's tent from the time I first heard shots until I started towards Garcia's tent, it was about one-half minute, maybe a minute. I started at once for Garcia's tent when I heard the shots.' Answering question, 'How far had you gone toward Garcia's tent when you were shot?' 'I had traveled about half a minute, may be.' Answering question, 'What part of body were you shot in?' 'Right about here' (shows legs and breast) (witness was wearing coat that he identified as the coat he had on the night of the killing, and at the time he testified that he himself was shot, and witness was permitted over the objections of the defendants to exhibit said coat with the shot holes in it to the jury)." Appellants' counsel objected to this testimony for various reasons. The court signs this bill with the following qualification: "There was a question of the direction from which Lopez was shot, hence the evidence of clothing." This evidence was admissible, taking the bill on its face as qualified by

the court. Wherever the clothing serves to elucidate any question in the case or explain it to the jury it is admissible for that purpose. A review of the facts would show that the direction from which this witness was shot, was one of the questions before the jury. The appellants were undertaking to show that Garcia, and not one of appellants, fired the shot which struck Lopez. The direction from which the shot came that struck Lopez became a question of some importance, as the verbal testimony was not clear and accurate. The introduction of the coat, therefore, was relevant testimony.

4. There are quite a lot of exceptions to the charge set up in the motion for new trial, and the refusal to give requested instructions, none of which, we think, are well taken. Among other criticisms of the charge is this: That inasmuch as Charves was shot and not Garcia, and that the attempt at robbery was of Garcia and not Charves, that the court was in error in instructing the jury in substance that in the attempt to commit the robbery of Garcia appellants would be equally guilty of the homicide in the perpetration of robbery, as if they killed Garcia. The language of the court is not here stated, but the substance of the point charged by the court only is stated. As we understand the force of the criticism, appellants' contention is that as the attempted robbery was of Garcia, that the killing of another man in the attempted perpetration of robbery could not be murder in the first degree. We are of opinion the court was correct in charging that the killing of Charves under the circumstances would justify a conviction of murder in the attempted perpetration of robbery, although Garcia may have been the real intended victim.

Deceased was present at the time, and when he undertook to leave the tent Milo shot him with a shotgun, and he was also shot with two pistol balls in the right breast, killing him instantly. The killing of Charves, under the facts, would justify the court in charging the jury as was charged, that the killing being in the perpetration of robbery would authorize the conviction for murder in the first degree under occurring circumstances. This is not like a case where a party shoots upon express malice at one individual and kills another against whom he has no malice. In that character of case the killing would usually be murder in the second degree. The evidence does not disclose that Milo shot at Garcia and killed Charves. They were in different parts of the tent, and the shot was directed directly at Charves and not at Garcia. We are not to be understood as holding that although the shot may have been fired directly at Garcia and Charves received the load, that the appellants would not be guilty of murder in the first degree in the perpetration of robbery; on the contrary we are of opinion that under such state of case they would be guilty of murder in the first degree. The statute, and the decisions construing that statute, have not yet laid down the proposition that the accused firing at the intended

victim in cases of robbery and killing another party would reduce that killing to murder in the second degree. The shooting would still be murder in the first degree, because the statute expressly says that all murder in robbery or in the perpetration of robbery would be murder in the first degree. This statute eliminates murder in the second degree in homicides of this character. The court submitted appellants' view of the case very favorably, we think, under the facts, and authorized the jury to acquit if appellants went to Garcia's tent for the purpose of recovering their money or for the purpose of arresting the parties on account of taking their money. To say the least of it, this portion of the charge was favorable to appellants.

A careful review of the record and the charges has convinced us the court committed no reversible error, and that we would not be justified in awarding appellants another trial.

The judgment is affirmed.

*Affirmed.*

[Rehearing denied May 4, 1910.—Reporter.]