Argued October 30, decided December 17, 1912.

**STATE *v.* HILL.**\*

(128 Pac. 444.)

Criminal Law—Appeal—Verdict—Conclusiveness—Trial— Questions for Jury.

1. In view of Section 139, L. O. L., making the jury the exclusive judges of questions of fact, and under Article VII, Section 3 of the Constitution as amended (Laws 1911, p. 7), providing that no fact tried by a jury shall be otherwise re-examined in any court, unless the court can affirmatively say there is no evidence to support the verdict, a verdict cannot be disturbed on appeal where there is any evidence to support it.

Larceny—Prosecution—Evidence—Sufficiency.

2. The possession of property recently stolen is a fact from which the jury may infer that the possessor was concerned in the theft, and evidence of such possession, together with proof of false explanations, will support a conviction.

Criminal Law—Evidence—Admissibility—Self-Serving Declarations.

3. In a prosecution for the theft of two horses which were found in accused's mountain pasture, a letter written by accused to his mother that he would take his cattle to that place when the grass improved was inadmissible, because not bearing on his intent in taking possession of the horses, being, at the most, a self-serving declaration.

---

\*On the question of possession of recently stolen property as evidence of larceny, see note in 12 L. R. A. (N. S.) 199.     REPORTER.

Larceny—Instructions.

4. In a prosecution for larceny, where accused introduced evidence that he had received the stolen horses innocently, supposing that his brother had purchased them, or that he became a party to the theft only after the original theft was complete, an instruction that, before accused could be convicted, the jury must believe beyond a reasonable doubt that he was guilty of or in complicity with the original unlawful taking, and any subsequent connection after that taking would not be larceny, and that if he received the horses from his brother or any other party after the felonious taking, and did not himself aid in such taking, he was not guilty, did not clearly point out the different defenses; and hence it was improper to refuse a requested instruction that, before accused could be convicted, the jury must believe beyond a reasonable doubt that he was guilty of or in complicity with the original taking, and that any subsequent taking would not be larceny.

Criminal Law—Trial—Instructions.

5. In a prosecution for larceny of horses, a requested instruction that if the horses mentioned were stolen, and were shortly found in the possession of defendant, no "legal" presumption of his guilt would arise, while technically correct, was properly refused, as tending to mislead the jury in making them believe that no inference of guilt arose from the possession of the stolen property.

From Sherman:   DAVID R. PARKER, Judge.

Statement by MR. JUSTICE MCBRIDE.

The defendant, Albert Hill, was jointly indicted by the grand jury of Sherman County with Walter Hill for the larceny of two mares, the property of Todd Bros. The evidence introduced by the State tended to show: That the mares were last seen by the owners about May 28, 1911, and at that time they were upon the range in Sherman County, near the premises of the owners. They were first missed on June 3d following. That on June 3d the animals were seen in the possession of Walter Hill, defendant's brother, at the Hill ranch, in Wasco County, and that on the 4th of June, Walter got one Eddie Plummer to ride one of the mares, with a view to

breaking her.  That on the 3d of June, Walter stated that he had bought the horses.  The evidence also showed that Walter and the defendant were partners in the stock business; that defendant lived about 40 miles from where the mares were stolen, and still farther from the Hill ranch, at which latter place the mother and stepfather of defendant resided; that defendant and his wife came to the Hill ranch on the 5th day of June.  A witness asked defendant at the time about the mares, and defendant said: "Yes; we just bought them," or "just got them." On the 28th of June the sheriff and some other parties went to a ranch situated in the foothills of the Cascades, in Wasco County, where defendant and his wife were then staying, and, it being early in the morning, knocked at both the front and back doors without getting any answer; but, after a considerable time, defendant made his appearance.  The direct testimony of the sheriff, corroborated by other witnesses, is as follows:

"I hired two more men to go with us, and we started early in the morning to the Barlow Gate ranch.  The two young fellows we hired were on horseback, and Mr. Todd and myself in the buggy, and we drove up to this Barlow Gate ranch where Albert Hill lived.  I got out and went to the front door, and knocked, but got no response.  I went around to the side door and knocked, and nobody answered me, so then I went out to the barn to see if his horses and saddle were there.  Then I went around to the front gate where Mr. Todd was staying in the buggy, and Mr. Hill had come out at that time, and was talking to him.  I went up and asked him if his name was Hill, and he said it was.  I said: 'I guess you will have to go to town with me to-day.'  He got pretty nervous, and said: 'I have said I wouldn't go any more.  They have had us down there several times, and it cost a lot of money, and I have said I wouldn't go any more, but since then I have got religion, and I have changed my mind.'  I told him I guessed he would have to go this time, and he said he wanted to go in the house and change his clothes, so I went in with him.  Before that I saw he was getting pretty nervous, and thought I would

throw him off the track a little bit in order to make it a little easier for him and avoid trouble, and I told him, 'I guess you have been selling a little too much booze down the river.' So he went in and changed his clothes. After he got ready, I took Hill right in the buggy and took one of the fellows in the buggy with us, and the three of us went on and we left Todd, and the other young man there to look after the horses. When we got to Tygh Valley Hill and I put up the team, and Mr. Hill and myself started down the street. Then I said to Mr. Hill that 'little joke I made up there about selling booze hasn't anything to do with what we arrested you for.' I said: 'We want those two black horses up there,' I said, 'they are there and you know it, and, if you wanted to be a man, you would have told us about it so we could have found them. We was at a lot of trouble. We have been to a lot of trouble and expense already.' He said: 'If they are up there, I don't know it.' I says: 'They are there, and you know it, and we know it, and any way it would be best for you to tell us where they are, so we could get them without any more trouble.' He still insisted he didn't know they were there. We talked a few minutes, and he said: 'If I hadn't been married, you never would have taken me.' He says: 'I seen you come through the gate.' I said: 'You would have shot me down without knowing who I was or without knowing my business nor anything about it, would you?' He said: 'I knew you were the sheriff.' 'Even a sheriff sometimes goes on civil business. It is not necessary to up and kill him.' He said: 'I might not have shot you, but I would have run and if anybody had tried to stop me, I would have shot him.' I seen there was no use in questioning him about the horses any further, so we dropped it there."

Q. "What was his condition at that time?"

A. "He was pretty nervous, and the tears were running down his face. That is, I didn't want to put him in such a state that we would have trouble. I took Willis, who I had arrested the night before, and put him in jail until after supper, then I got a rig and took them on to The Dalles that night. The next day I brought them home."

Q. "Mr. Freeman, during the conversation with him there at the ranch or any time, did he ever tell you whether the horses—that the horses were there?"

A. "No, sir."

Q. "Or that any horses were there?"

A. "No, sir; he never did."

Q. "Did you have any conversation with him in regard to how he and his brother were doing business together?"

A. "I did once, at the other term of court."

Q. "What did he say?"

A. "He told me they were partners in everything; that they didn't own anything, but that they were both partners in, and had been for years."

After the sheriff had left the ranch with defendant, his assistants found the two mares in a small brush pasture near the house. They had upon them the hair brand of the Hill Bros. The mares were two year olds, but the mane of the larger one had been clipped where the collar usually rests, so as to give it the appearance of having been worn by a collar. All other testimony introduced by the State was merely corroborative in some particulars of the testimony here recited. There was no evidence tending to show that defendant was at the Hill ranch after the 24th day of April until his alleged visit there on June 5th. At the close of the State's testimony, the defendant's counsel moved for a directed verdict, which was denied.

The defendant testified substantially as follows: That he is 27 years old, and lives on Gate Creek, and that he had lived there a little over a year; that prior to that he lived on the Deschutes River on what is called the Hill ranch; that he was married on April 23, 1911, at the church above Wamic; that his mother and Walter Hill were at his wedding and left there on the next day, April 24th, and that he never saw Walter after that until the 7th of June; that from the date of his wedding until the 7th of June he was on his place at Gate Creek, and was only away from there one night at the time he went back

in the mountains to Bonney meadows to take salt up there, and see whether the feed was fit to put the cattle back in the mountains that early or not, and that this was about the 20th day of May, but that he left in the morning, and got back on the next day at 10 o'clock; that his wife was at her mother's one night, going down in the evening and coming back the next morning; that he first saw the two black fillies in question down on the river in the barn on the 7th of June; that he never knew before at any time that there were any such animals, never had heard of them; that they were tied in the barn when he first saw them, and that he took them away with him when he went home, as testified by his mother and wife; that he took 116 head of cattle and 4 horses, 2 saddle horses and 2 pack horses; that they went right up back of the house up the canyon clear out to the county road; that the road from the Hill ranch to the county road is a private road, and runs for two miles through wheat fields, and that the people would not allow any person to drive cattle through the wheat fields, and that the way they went was the only natural way to take the cattle out; that they took them to the county road at the most accessible point, and then followed the county road on the way up to the point where they took them off the road to the mountains; that the first day they went as far as the old McAtee place, where they camped out with the horses and cattle; that the next day about noon they got to Tygh Valley where they took dinner, and they took the cattle through the town and came back and stayed there a while, then went on and took the cattle on the top of the hill, and then went on to his wife's home and stayed all night; that the next day he went back and got the cattle and took the fillies and turned them into the pasture; that he has two pastures, one lies above the road and the other below, and one is long and the other is three-cornered, and the county road runs

between them; that there are from 20 to 25 or 30 acres in each of the pastures; that they were left there in those two pastures until the sheriff came and arrested him; that the sheriff arrived there about 6 o'clock, and that he was still in bed; that the sheriff just came and knocked, then went back out to the gate, and never waited for any response; that then he went back to the gate and then on to the barn; that the witness got up and went out to the gate, and there was a buggy there and three men, two of them on horseback, and the sheriff was coming back from the barn through the gate, and the sheriff told him he had to go with him; that he told the sheriff that he had said that he would not go again, and that he was referrring to a time that he got into a dispute in The Dalles, and got into a fight, and got hammered up, and they started in to arrest him, and that he said at that time that he would not be arrested any more; that he was alluding to this other time, and that he stated to the sheriff that he had since got married and had got religion, and had changed his mind about things of that kind, and that things were altogether different with him than what they were before; that he also had a conversation with the sheriff at Tygh Valley, and the sheriff told him that there had been a lot of horses stolen, and that he (the witness) was mixed up in it; that he told the sheriff, if there had been any horses stolen, it was more than he knew anything about; that he did not deny that the horses were up there at his place; that they were there at the time the sheriff was there; that they were right in the pasture at the side of the barn, and there was nothing said about them while they were there; that two of the men had stayed behind; that he (the witness) knew that two of the men had stayed behind; and that the two fillies were right there in the pasture by the barn. On cross-examination the witness further testified that he told the sheriff that the fillies were there in the pas-

ture, and that he knew that he had not bought them; that he got them on the Hill Bros.' ranch in Wasco County; that he did not buy them, but Walter Hill turned them over to him; that he asked Walter where he got them, and Walter told him that he bought them, and that he paid $50 for one and $75 for the other; that Walter did not have any account of the transaction; that he never carried any checkbook, but the witness "done all the business," and, if Walter had any transaction in any way, he used his money for it; that Walter had money to buy with, and that the witness did not give him the money; that Walter had gathered the cattle and had them on the Wasco County side before the witness went to the ranch; that he "packed" the fillies from the lower ranch to the upper ranch; that he knew they were practically unbroken horses. Mrs. Wearyrick, the mother of defendant, testified that defendant was married on April 23d, and that she left the Gate Creek ranch, where he resided, on the 24th, and that he was not back again at the Hill ranch until June 7th; that on June 11th, he and his wife, Eddie Plummer, and Walter Hill, started to the Gate Creek ranch in the Cascades, to take some cattle up there to graze; that they took about 100 head of cattle and pack horses and the horses they rode; that she saw Walter bring the mares to the ranch on June 3d; that they had previously received a letter from Albert in reference to taking the cattle away from there, and that Walter read the letter and handed it to her. She identified the letter, and it was offered in evidence, and rejected, to which defendant excepted. The defendant was convicted, and appeals.          REVERSED.

For appellant there was a brief over the names of *Mr. William H. Wilson and Mr. George Mowry,* with an oral argument by *Mr. Wilson.*

For the State there was a brief over the names of *Mr. James E. Burdett,* District Attorney, *Mr. Isaac H.*

*Van Winkle,* Assistant Attorney General, *Mr. C. M. Huddleson,* Deputy District Attorney, and *Mr. Robert R. Butler,* with oral arguments by *Mr. Burdett* and *Mr. Van Winkle.*

MR. JUSTICE MCBRIDE delivered the opinion of the court.

1. Under the recent amendment to our constitution (Article VII, Section 3), if there is any evidence to support the verdict, this court cannot disturb it. The jury are the exclusive judges of all questions of fact. Section 139, L. O. L.

2. Upon the case made by the State we are of the opinion that there was evidence tending to indicate defendant's guilt sufficient to go to the jury. The possession of property recently stolen is a fact from which the jury may infer that the possessor was concerned in the theft. Wharton, Criminal Evidence (10 ed.) § 758. Mr. Wharton says:

"Taking up, then, the point immediately before us, we may say that a court may properly tell the jury that the possession by a party of stolen goods is a fact from which his complicity in the larceny may be inferred. But the possession must be personal, must be recent, must be unexplained, and must involve a distinct assertion of property by the defendant. If the explanation involves a falsely disputed identity or other fabricated evidence, the inference increases in strength; and so where the goods are part of a mass of stolen property, and where the case is that of a forged instrument held by one claiming under it. But in any view the question is one of fact."

Here the possession was recent and personal. It was unexplained—in fact, the evidence for the State indicates that defendant denied the possession, and falsely stated that, if the mares were upon his place, he did not know it. These facts were sufficient to authorize the jury to infer that he was a fellow conspirator in the theft, that he might have been a receiver only of property previously stolen by another was a matter for the jury; they being "the judges of the value and effect of the evidence."

3. The letter offered in evidence was properly excluded. We do not question the position of counsel that in certain cases declarations indicating plan and purpose, made so long before an act is done as to preclude the probability that they were fabricated for the purpose of deception, may be a part of the *res gestae,* and, as such, admissible, *U. S.* v. *Craig,* 4 Wash. C. C. 729 (Fed. Cas. No. 14,883) ; Trial of *Spencer Cowper,* 13 Howell's State Trials, 1106; *Garber* v. *State,* 4 Cold. (Tenn.) 161; *The Queen* v. *Chasson,* 16 New Brunswick, 546; *Grimes* v. *State,* 68 Ind. 193. But this letter did not characterize the act or purpose of defendant in taking the mares. It indicated that at some time in the future, when the grass improved, he would take the cattle that were on the Hill ranch to the mountains to pasture, which he did on the 11th of June. Nobody intimates that such intent was criminal, or that his act of driving the cattle was criminal, or that there was anything wrong or unusual in his coming to the Hill ranch for that purpose. The letter throws no light upon his intent in taking possession of the horses, or in taking them to his ranch, or in making the alleged claim of part ownership to the witness McKean. Testimony of this character is so often self-serving that courts are loth to admit it in any case.

4. The defendant's counsel requested the court to give the following instruction:

"Before you can convict this defendant, you must believe beyond a reasonable doubt that he is guilty of, or in complicity with, the original taking, and any subsequent connection after the taking would not be larceny in him, whether in good or bad faith; and if you believe that this defendant received the horses in question from Walter Hill, or any other party, after the felonious taking, whether in good or in bad faith, he is not guilty of larceny, and you must acquit him."

The court refused the instruction, and gave the following:

"Before you can convict this defendant, you must believe beyond a reasonable doubt that he is guilty of, or in complicity with, the original unlawful taking, and any subsequent connection after the taking would not be larceny in him, and, if you believe that this defendant received the horses in question from Walter Hill, or any other party, after the felonious taking, and he himself did not assist and abet in such felonious taking, he is not guilty of larceny, and you must acquit him."

There was room for argument as to whether the defendant had taken the horses in pursuance of a conspiracy with his brother, or had subsequently received them from him with a view of concealing his brother's theft, or whether he had received them innocently, supposing Walter had purchased them for the partnership. If he received them innocently, supposing that his brother had purchased them, this, of course, would acquit him, or, if after the original larceny was complete he for the first time became a party in the transaction, having no connection as a conspirator in the original theft; but, being informed of it before he received them, he would be guilty of the crime of receiving stolen property, but not of larceny. The instruction asked made this distinction clear. The instruction given did not so clearly point it out. Testimony had been given that these men were partners and had been so from boyhood, that their property was acquired and held in common, and the jury might be inclined to the idea that under these close relations the theft of one of the partners would be the theft of both. To a lawyer the instruction asked and the one given would convey the same idea. To a layman they might or might not. It was error under the circumstances and evidence in this case to refuse the instruction.

5. The defendant's counsel asked the following instruction:

"You are instructed that if you believe from the evidence of the case beyond a reasonable doubt that the mares mentioned in the indictment or either of them were stolen from W. C. Todd and C. A. Todd, who were partners and that they were the owners thereof, and that shortly after the theft the same were found in the possession of this defendant, Albert Hill, I charge you that no legal presumption of his guilt arises therefrom."

This instruction, while it states the law correctly, was likely to be misleading to the jury. It is true that the recent possession of stolen property does not raise a legal presumption that defendant is guilty of larceny. It is simply a circumstance from which the jury may or may not as a matter of fact infer guilt; but it would require a long explanation to draw the distinction between a presumption of law and an inference of fact, and the instruction should not have been given in the form presented. The weight to be given to the circumstance adverted to is fully explained in instruction No. 7, which correctly and clearly states the law.

For the reason that the court failed to give the instruction in regard to the good or bad faith of the defendant in taking possession of the property, the judgment is reversed, and a new trial ordered.          REVERSED.