CLARENCE ALDRIDGE v. THE STATE.

No. 6797.    Decided May 10, 1922.

**1.—Murder—Clothing of Deceased—Evidence.**

Where, upon trial of murder, there was no serious controversy concerning the distance between the parties at the time the fatal shot was fired, etc., and the location of the wound, the introduction of the wife of the deceased to identify the articles of clothing worn by the deceased at the time of the homicide, was reversible error. Following Cole v. State, 45 Texas Crim. Rep., 233, and other cases.

**2.—Same—Remarks by Judge—Practice on Appeal.**

Where the judgment is reversed and the cause remanded for other reasons, the complaint as to the remark of the court during the trial need not be considered.

Appeal from the District Court of Camp. Tried below before the Honorable R. T. Wilkinson.

Appeal from a conviction of murder; penalty, fifteen years imprisonment in the penitentiary.

The opinion states the case.

*J. D. Bass,* and *C. E. Bryson,* and *Cy Engeedow,* for appellant.— Cited cases in opinion.

*R. G. Storey,* Assistant Attorney General, for the State.—Cited cases in opinion.

MORROW, PRESIDING JUDGE.—Conviction is for murder; punishment fixed at confinement in the penitentiary for a period of fifteen years.

John Bollware was shot and killed by the appellant. The homicide took place at a picnic.

Appellant and one, Ray Kelley, came to the picnic together in a buggy. Upon their arrival, the deceased approached and sought an interview with the appellant, after which he went to a store about eighty-five yards distant, appellant in the meantime having gone to the place on the grounds where a barbecue was proceeding and engaged in conversation with the witness Tom Traylor. While there, the deceased came from the store and was killed. Several shots were fired by both appellant and the deceased. The appellant was wounded. The pistol used by him was larger than that used by the deceased, and according to some of the testimony, the report from it was louder. Touching the conversation that took place, there is a conflict in the evidence, as is illustrated by the testimony of the State's witness, Tom Traylor, and that of the appellant and his witness, Ray Kelley.

According to Traylor, the deceased said: "Yonder is Mr. Aldridge; I want to speak to him." He immediately approached and accosted him, saying: "I want to speak to you. I heard you have been saying something about me." Aldridge said: "No, I been hearing from you all the way. I have been hearing from you, and I come out here to settle it with you." The deceased said: "All right," and walked away to a store about eighty-five yards distant. Appellant, who was standing by a tree, said while the deceased was gone: "I am going to kill that son-of-a-bitch this evening." The deceased returned and appellant said: "You think I am scared of you." Deceased then said: "You have no right to be scared of me," and before he could get the words out, appellant jumped to him and shot him with a "38" pistol. Deceased went around and around and kind of steadied himself and began shooting with an automatic pistol. He emptied this and fell to the ground while appellant was still shooting at him. Appellant fired twice after the deceased fell; appellant also fired twice before the deceased fired.

Appellant testified that on reaching the picnic and while the buggy was yet in motion, deceased hailed him and said that he wanted to see him right now, and said: "I heard you told Tom Traylor that I was trying to get his wife out." Appellant denied this, and deceased said: "Well, denying it won't save you. I made up my mind that when I saw you, I would kill you or you would kill me one. You stay here until I come back." He went to the store and appellant went to where they were barbecuing meat, and while there he saw the deceased coming out of the store and put on his jumper. Tom Traylor said to appellant: "You better get on away from here, John said he was going to kill you." While in conversation with Taylor, the deceased approached and said: "Clarence, you don't believe I will kill you." He then shot the appellant and broke his arm. He fired

two or three times before the appellant could get his pistol. When appellant shot, the deceased staggered to his knees and commenced firing again. Appellant then got behind some little trees and shot twice. Appellant denied making any threats against the deceased. Appellant drew his pistol after the deceased began firing.

Ray Kelly testified that deceased told appellant he wanted to speak to him, and said: "I heard that you and Wilson Bell was up to Cliff Heath's and trying to get Tom Traylor's wife out." Appellant denied this, and Traylor spoke up and said: "I have been telling this man all the evening that he never told me that. Deceased then said: "You stay here, and when I come back I will kill you or you will kill me one." Deceased went in the direction of the store and the witness and appellant went to the place where the barbecue was in progress, and while standing there talking to Tom Traylor, deceased came back from the store, having put his jumper on, and said: "I don't believe I will do it to you," and commenced shooting. The witness heard but one gun fired and ran. After the shooting, he heard appellant calling him, and he found him in the bushes with his arm wounded. He was shot twice in the left arm. The deceased shot twice before appellant shot; that is, he heard the deceased shoot twice before he ran, and then he heard another gun fired.

Several witnesses for the State supported the State's theory that the appellant fired first. Some of the eyewitnesses were at a distance and described the reports from the guns. Appellant's theory that the deceased fired first is also supported in a similar manner. It was shown without controversy that the deceased, on several occasions shortly before the homicide, had threatened to kill the appellant, and that these threats had been communicated to him prior to the homicide.

The State introduced the wife of the deceased and she identified articles of clothing worn by the deceased at the time of the homicide. Objection was urged to the introduction of this testimony describing the garment and also to the introduction of the garment itself. In qualifying the bill, the learned trial judge justifies his action upon the ground that "there was a sharp controversy concerning which fired first, and stating that one of the witnesses testified that appellant's pistol was almost against the breast of the deceased at the time it was fired and because of this the jumper of the deceased was powder burned; that appellant, in his testimony claimed that he was about eight feet distant when the first shot was fired. The jumper had been washed by the wife of the deceased and there were marks upon it indicating powder burns." The location of the wound described by witnesses appears to have been established with certainty and without dispute, it being just under the left nipple. At the time of the trial, there was no blood upon the jumper, but it was slightly soiled.

Concerning the position of the parties from the eyewitnesses we take the following statements·

The State witness, Tom Traylor, testified on this point:

"Mr. Aldridge jumped out like this and shot him in the side and he went round and round. He 'stuck' his pistol close enough to Mr. Bollware to scorch his jumper when he first fired."

The State witness, Luna Reese, testified on this point:

"John Bollware came walking along from the store and when he was right even with me was when Clarence Aldridge stepped up and shot him. I did not hear anything but the shooting. When Bollware passed me was when Clarence Aldridge made his step forward with a gun, and I thought he was going to stab him until the gun fired. . . . When Clarence shot John, he was going right on by there, and I thought Clarence was going to stab him."

The witness, Ray Kelley, testified on this point:

"They was pretty close together. I don't know that they were so close that when Clarence shot him the powder burned his coat and hat."

The defendant testified on this point:

"I admit that I shot him with that six-shooter and killed him. John Bollware shot three times and when I shot him he checked up a little bit. . . . I don't know how close I got to him, but I know he was six or eight feet from me when he told me he would kill me and stepped on towards me and when I shot at him he was coming towards me. . . . "John Bollware stepped around from behind Mart Gohlson and he was close to me and spoke to me. He stepped up this way and Mart was standing down here (demonstrating). I don't know whether he spoke to Mart, but he was right up on me with that pistol. When Tom Traylor spoke to me, John was right up behind me and said he was going to kill me."

We fail to observe any serious controversy concerning the distance between the parties at the time the fatal shot was fired; nor do we comprehend the importance of that phase of the case. Admittedly, they were within a few feet of each other and both were shot. The clothing of the deceased was powder burned. The position of the wound was upon his breast. From any standpoint revealed by the evidence or the explanation in the bill of exceptions, they were close together. Both of them used their pistols and both were wounded, and the deceased fatally.

Viewed in the light of the undisputed evidence of threats upon the part of the deceased against the appellant and the suggestion in the record that as viewed from appellant's standpoint, the deceased went to the store and armed himself, then came to the appellant for the purpose of executing his threat, the matter as to who fired the first shot apparently was over-estimated. At least, it occurs to us as not of controlling importance.

The introduction of the garment worn by the deceased bore evidence of conflict, and was relevant upon no controverted question. It is true that there is a slight discrepancy as to the exact number of feet that may have separated the parties at the time the deceased was shot, but there is no question that at that time he was so near the appellant that the explosion which killed the deceased also burned his jumper. The use of the clothing worn by the deceased and bearing marks of conflict, especially when identified by the widow, is always regarded as inflammatory in its nature and, as a rule, should be excluded. Cole v. State, 45 Texas Crim. Rep., 232, and other cases listed in Branch's Ann. Tex. Penal Code, Sec. 1855. A well-defined exception to this rule is thus stated in Dugan v. State, 82 Texas Crim. Rep., 426:

"It is permissible to introduce bloody clothing only when the introduction serves to illustrate some point or solve some question, or throw light upon the matter connected with the proper solution of the case, and under no other circumstances; but whenever the introduction of such clothing would, in the light of the whole case, aid the jury in arriving at the very truth of the matter, the court should not hestitate to admit its production and exhibition," citing Milo v. State, 59 Texas Crim. Rep., 196; 127 S. W. 1028; Adams v. State, 48 Tex. Cr. Rep., 460; Sue v. State, 52 Tex. Cr. Rep., 126; Williams v. State, 60 Texas Crim. Rep., 453; 132 S. W. 345.

Under this exception, the evidence complained of in the instant case was not admissible. That its tendency was hurtful cannot be denied. As applied to the facts of the instant case, it was calculated, in our judgment, to injure the appellant in that it tended to confuse the jury and direct their minds to an immaterial issue, thereby diverting them from the true question in the case. That issue manifestly was whether appellant, viewed from his standpoint, in the light of threats and the surrounding facts, was justified in the homicide. This might have been true although he fired the first shot, but so far as we are able to discern, the exact distance between the parties at the time appellant fired was entitled to no controlling place in the conduct of the trial. The garment apparently was admitted upon that issue. Even if that had been an issue of importance, the conceded facts, that is, the location of the wound and that the clothing of the deceased was powder burned by the appellant's pistol rendered the introduction of the clothing unnecessary and inappropriate. Its receipt was manifestly calculated to injure the appellant's case. In the light of the evidence, we are unable to determine to what extent this evidence may have influenced the jury, and we are certainly not in a position to say from the record that its effect is not reflected in the verdict of conviction or in the punishment assessed.

Another bill complaining of the remark of the court in the presence of the jury is presented, but in view of the disposition of

the case, it will not be discussed, as it is not likely to occur again.

Because of the error pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*