Argued March 23; affirmed April 24, 1934

STATE *v.* ENLOE ET AL.

(31 P. (2d) 772)

*George Neuner,* of Portland (Neuner & Kimmell, of Portland, on the brief), for appellants.

*George Mowry,* of Portland (Lotus L. Langley and John Mowry, both of Portland, on the brief), for the State.

KELLY, J. During the events of this case, all of which transpired in the city of Portland, Oregon, defendants were dealers in slot machines each operating his business for himself and not associated therein with the other. One Clyde S. Betts was conducting a private detective agency. One Ben Wilson apprised Betts that two slot machines had been stolen from an establishment described as a bootleg joint. These stolen slot machines were owned by defendant, Earl Wurzweiler. Betts made an agreement with Wurzweiler that he, Betts, would secure possession of the two stolen machines and return them to Wurzweiler at his place of business at 431 Glisan street, Portland, Oregon. At Betts' insistence Wurzweiler advanced $75 to Betts and agreed to pay him $10 in addition thereto upon the delivery of the machines.

Betts paid $50 to Wilson and Wilson says that he paid $40 to one Yeager. Wilson testified that he and Yeager stole the machines. Wilson took Betts' automobile, went with it to a hotel, where the machines had been cached, took them down the back stairs of the hotel, placed them in Betts' car and drove to Second and Washington streets where Betts and one Simkins were in waiting. Betts and Simkins then took the auto and drove to Wurzweiler's establishment. There, they, Betts and Simkins, were directed to go into the back room where there were several men. It was in this room that the crime was committed of which defendants herein were convicted.

■ Defendants urge that the trial court erred in admitting in evidence the license issued to the prosecuting witness and his associate in business by the city of Portland authorizing them to conduct a detective agency in that city; and in permitting witnesses to testify as to arrangements between themselves in carrying on that business. The case of *State v. Evans,* 98 Or. 214, 234 (192 P. 1062, 193 P. 927), is cited to this point. In that case evidence was held to be immaterial, which disclosed that the prosecuting witness identified the defendant at any other time or place than at the time and place of trial. The court also disapproved the introduction of testimony of such identification on rebuttal.

The case of *Pickrell v. State,* 5 Okla. Cr. 391 (116 P. 957), is also cited by defendants. There, over the objection of defendant, the county attorney repeatedly asked the defendant how many times a former employee of defendant had been convicted of crime. It is true that in that case Mr. Justice Doyle, speaking for the court, said: ''Generally speaking, a private detective is not over-scrupulous in the truthfulness of his testimony.'' But, it nowhere appears in that case that the court thought that, when a witness is duly licensed to act in that capacity, such fact may not be shown as an aid in determining how much or how little credit should be accorded to his testimony.

In *State v. Hill,* 63 Or. 451 (128 P. 444), also cited by defendants, it was held that a letter written by accused to his mother was irrelevant and in the nature of a self-serving declaration.

In *State v. Smith,* 43 Or. 109 (71 P. 973), the exclusion of a self-serving declaration by defendant was upheld. In *State v. McCann,* 43 Or. 155, 157 (72 P. 137),

it was held that what the prosecuting witness might have said after the altercation with defendant was no part of the *res gestae* and therefore not admissible on that ground.

These authorities do not sustain defendants' position.

"Questions regarding the age, antecedents, business, and experience of a witness are largely within the discretion of the court; and unless it manifestly appears that such questions are put for an improper purpose, such discretion is not reviewable on error." Cochran v. United States, 157 U. S. 286 (15 S. Ct. 628, 39 L. Ed. 704).

■ Defendants also predicate error upon the admission in evidence of the coat worn by the prosecuting witness when he was assaulted and also upon the reception in evidence of an X-ray film showing an injury to the nose of the prosecuting witness.

The argument of defendants upon this phase of the case is that there was no dispute in the instant case of any assault and battery. In this, we are unable to agree with defendants. Their pleas of not guilty put in issue the allegation in the indictment that the prosecuting witness had been assaulted and beaten. We find no admission on defendants' part anywhere in the record which would have had the effect of relieving the state of the onus of proving such assault and battery. The quantum of proof on that disputed question is not for the defendants to control.

It does not appear just how or why the state should be charged, in advance of such action on defendants' part, with the effect of defendants' total failure to produce a scintilla of evidence tending to disprove that the prosecuting witness was the victim of a most cowardly and brutal beating.

Accompanied by the oral testimony as to the film by the diagnostician, and as to the coat by the expert on blood tests, these exhibits tend strongly to corroborate other evidence disclosing the degree of injury and the extent of the violence involved in the crime charged. No error was committed by the learned trial judge in receiving these exhibits in evidence. As to the admission in evidence of the tie and trousers, no point is attempted to be made by defendants.

*State v. Kingsley,* 137 Or. 305 (2 P. (2d) 3), cited by defendants, is a homicide case and there this court, speaking through Mr. Justice Brown, said:

"But, in any event, the clothing worn by the person killed or by the accused may be introduced in evidence in a prosecution for the killing whenever it may in any way aid in explaining or determining any disputed question in connection therewith. Wharton on Homicide (3d Ed.), § 610."

*State v. McKnight,* 21 N. M. 14 (153 P. 76), cited by defendants, in an exhaustive and scholarly opinion by Mr. Justice Hanna, states the rule thus:

"* * * it is a well-settled principle that, in homicide cases, the clothing of the victim, when properly identified, may be produced as demonstrative evidence on the theory that it is a part of the *res gestae,* and tends to inform the jury of the character and nature of the wounds, the motive of the crime, the manner and means of death, the proximity of the defendant and the deceased when slain. Underhill on Criminal Evidence, § 48."

*Aldridge v. State,* (Tex. Cr. App.) 241 S. W. 145, also cited by defendants, is a homicide case in which the defendant himself testified that he had done the killing. The defendants also cite *Flege v. State,* 93 Neb. 610 (142 N. W. 276, 47 L. R. A. (N. S.) 1106).

All of the cases, cited by defendants, on this point are homicide cases where the death itself is easily and undeniably established, while the case at bar deals with an alleged assault and battery alleged to have been committed under circumstances requiring of the state cogent proof.

■ Defendants contend that the learned trial court erred in overruling their motion for a directed verdict.

In dealing with this contention, we must bear in mind section 14-1002, Oregon Code 1930, which is as follows:

"All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the crime, or aid and abet in its commission, though not present, are principals, and to be tried and punished as such."

As stated, there were a number of men in the back room of Wurzweiler's place when the assault and battery was committed. Two men, one attired in a gray suit, the other in brown, are said to have delivered the blows. Betts, the prosecuting witness, was dazed and as he became aware of what had happened he observed Wurzweiler walking from the back of the room. Wurzweiler then said something to Betts "about letting machines alone after this".

Simkins testified that he too was beaten and threats were made about searching him. He was asked:

"Q. Who was it mentioned about searching you?
"A. I think Mr. Wurzweiler—or Mr. Enloe."

Blood was upon the floor. Simkins testified also that Enloe said to him: "You rat son-of-a-bitch get a mop and clean that blood up."

Simkins also testified that there were those there who expressed an intention to wreck Betts' car; but Enloe said, "Don't do that; we don't want the machine broken up at all."

Simkins also testified that when he described the man from whom Betts and he had obtained the machines, Betts then told them that it was Wilson. When they asked Betts where Wilson lived and he was slow about telling them, "Mr. Enloe, I think it was, said: 'Give him some more of it' and the man in the gray suit and the man in the brown suit each hit him once or twice again, and Mr. Enloe said, 'That is enough'. And they put cold towels on Mr. Betts' head."

We quote further from Simkins' testimony:

"A. * * * Anyhow, they searched Mr. Betts, they went through his pockets, they turned his pocketbook inside out, and in this watch pocket of his pants (indicating) they found five $5 bills in the pocket of Betts' pants. And the man in the gray suit handed it to Mr. Enloe.

"Q. The five $5 bills?

"A. Five $5 bills. Mr. Enloe placing it on a bench or giving it to someone to place there, I don't know which. And Mr. Wurzweiler wasn't in the room at the time, he was out in front some place, and he came in and Mr. Enloe says, 'Here Earl, is twenty-five dollars of your money'. Mr. Wurzweiler took the money and he gave each of these men that had been beating Mr. Betts five dollars each, that is, he gave four of them five dollars each, and I saw him go back toward the sink and hand something to that man; I don't know whether it was five dollars or what it was, but he handed him something. Mr. Betts had told them where Mr. Wilson lived, and Mr. Wurzweiler and the man with the gray suit, I am thinking, anyhow they left, went out, was gone about twenty minutes and came back with this Mr. Wilson.

"Q. Now, before you get to their coming back with Mr. Wilson, have you told practically everything that was said or do you remember any more things that were said? Was anything said to you?

"A. Well, yes, there was. Mr. Enloe spoke to me and he says, 'You better start talking, too, you haven't told us all you know'. He says, 'You rat son-of-a-bitch, we will send you to the hospital, we will cave your ribs in, you will ride there in an ambulance.' That was before they went after Mr. Wilson.

"Q. Now, do you remember any other statements or things that were said? Was the subject as to why this assault was being perpetrated being discussed by any of them?

"A. Mr. Enloe said he had paid eight thousand dollars for protection from just such a thing as this and he wasn't getting it, and by God, he was going to take it in his own hands and stop it. He said, 'If I can't get protection, I can get it my own way.'

"Q. Was there anything said about his connection with Wurzweiler or whether they were connected?

"A. Well, yes, there was. Mr. Enloe said, 'I suppose you think it is funny I am down here with Earl'. He says, 'You know he is my competitor. But,' he says, —that is when he told us about the eight thousand dollars, that he had paid eight thousand dollars, he didn't say who to or anything about it, to stop this, and he was going to stop it in his own way.''

The witness also recounted that Enloe secured the presence of Wilson, and harshly interrogated him after Wilson had been struck two or three times resulting in a statement from Wilson that one Yeager had stolen the machines.

We are not unmindful that Simpkins had been convicted of the crime of drunken driving, nor are we approving the manner in which Betts attempted to profit by the criminal operations of Wilson and Yeager at the expense of Wurzweiler; but we cannot come to any other conclusion than that the record supports the

course taken by the learned trial judge in overruling defendants' motion for a directed verdict.

▇▇▇▇ Defendants argue that the trial court ought not to have told the jury that—

"A person is presumed to intend the ordinary consequences of his voluntary act. But that is a legal presumption which is not conclusive. It is a presumption which may be disputed and may be overcome by evidence."

We cannot follow this argument. When the man in the brown or gray, whichever it was, struck Betts and knocked him into a dazed or semi-conscious state, and later, when at Enloe's express direction, both of them again struck him, the presumption thereupon arose that they intended to inflict the injury which would ordinarily ensue from such blow or blows. The result which ordinarily follows a blow in legal aspect is some evidence of the intent with which such blow is administered. The jury was entitled to this instruction. There is no direct evidence of the specific intent with which the men in brown and gray struck Betts. The requisite intent in order to make the action a crime is to do violence and injury to the person of Betts. In the absence of direct evidence, the presumption under discussion is a valuable guide to the triers of fact, who are called upon to determine whether such intent has been shown. It is idle to say that the employment of bruisers to beat up another man and the payment to such thugs of money for their nefarious service do not constitute aiding and abetting the crime involved in the chastisement thus accomplished.

The court did not abuse its discretion in overruling defendants' motion for a new trial.

The judgment of the circuit court is affirmed.

RAND, C. J., and BELT and ROSSMAN, JJ., concur.